ESTATE OF RYERSON: MCARTHUR, Executor, and others, Appellants, vs. THE STATE (DEPARTMENT OF TAXA-TION), Respondent.

*October 8—November 7, 1941.*

124

For the appellants there were briefs by *Wood, Warner & Tyrrell* of Milwaukee, attorneys, and *Scott, MacLeish & Falk* of Chicago, Illinois, of counsel, and oral argument by *Richard H. Tyrrell* of Milwaukee and *Guilford R. Windes* of Chicago.

For the respondent there was a brief by the *Attorney General, Harold H. Persons,* assistant attorney general, and *Neil Conway,* inheritance tax counsel, and oral argument by *Mr. Persons* and *Mr. Conway.*

ROSENBERRY, C. J. We are confronted in this case with a controversy relating to the value of property, a type of controversy which apparently is becoming more and more common due no doubt to the wide range which property values have taken in the last ten years. Despite the fact that it is well established in this state (*Estate of Nieman* (1939), 230 Wis. 23, 283 N. W. 452), that under the circumstances such as exist in this case, a trial court's determination of value will not be disturbed unless it is contrary to the great weight and clear preponderance of the evidence, petitioners make a vigorous attack upon the determination of the trial court. The most substantial argument put forth in support of petitioners' position is the fact that the property was ultimately sold by the executor for $50,000. The petitioners claim that this sale was made under such circumstances that it fairly established the "clear market value" of the property. (Sec. 72.01 (8), Stats.) This court has held that the terms "fair market value," "cash value," and "clear market value" are for all

practicable purposes identical. *Will of Matthews* (1921), 174 Wis. 220, 182 N. W. 744.

Questions such as are raised in this case with respect to the assessment and levying of taxes are of increasing importance because of the increasing rate of taxation. Under present rates of taxation an exorbitant valuation may and probably often does amount to confiscation. Because of the importance of the matter involved, we have thought it wise to re-examine the matter. We must start out in this case with the proposition that we are not dealing with a valuation fixed by an assessor for purposes of taxation, which has been approved by a board of review. In this case the determination of value made by the trial court cannot be disturbed unless it is contrary to the great weight and clear preponderance of the evidence. We find no statutory provision which gives the finding of a county court as to the value of an estate for inheritance tax purposes any greater conclusiveness than a finding of fact in any other type of controversy.

Inasmuch as the principal contention made by the petitioners is that the price at which the property sold under the circumstances of this case is controlling, we are obliged to consider the effect of a sale as determining clear market value. "Market value" is a term frequently used not only in the statutes of this state but in that of many other states. It has been defined by this court as follows: Clear market value is the sum which property would bring on a fair sale when sold by a willing seller not obliged to sell to a willing buyer not obliged to buy. *Allen v. Chicago & N. W. R. Co.* (1911) 145 Wis. 263, 266, 129 N. W. 1094; *Rahr Malting Co. v. Manitowoc* (1937), 225 Wis. 401, 274 N. W. 291.

To the same effect are the decisions in other jurisdictions: *State ex rel. State Highway Comm. v. Stoddard Gin Co.* (Mo. App. 1933) 62 S. W. (2d) 940; *Appeal by Borough of Millbourne* (1938), 329 Pa. 321, 198 Atl. 49; *McCallister v.*

*Sappingfield* (1914), 72 Or. 422, 144 Pac. 432; *Louisville & N. R. Co. v. R. E. E. DeMontluzin Co.* (1928) 166 La. 211, 116 So. 854; *Palmer v. Penobscot Lumbering Asso.* (1897) 90 Me. 193. See cases cited in 26 Words and Phrases (perm. ed.), 562 *et seq.*

This court had occasion to consider sec. 70.32, Stats. 1921, in *State ex rel. Northwestern M. L. Ins. Co. v. Weiher* (1922), 177 Wis. 445, 447, 188 N. W. 598. The language of that section was:

"Real property shall be valued by the assessor from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale," etc.

In that case a building which was completed in 1915 at a cost of $3,156,228.03 was assessed for $2,750,000. On *certiorari* to the circuit court the valuation was fixed at $1,350,000. It appears without dispute in the case that the property could not be sold for its original cost, and the question for determination was, What was the full value which could ordinarily be obtained for it at private sale? In this case the matter received more extended consideration than in any other to which our attention is presently called, due no doubt to the fact that the valuation as fixed by the circuit court was less than half of the original cost of the building, which had been completed in 1915. The controversy having arisen over the assessment made in 1921, the court said (p. 449):

"It is true that in cases such as this too low a valuation seems at first blush to be established for taxation purposes. But it most be borne in mind that the state asks a tax only upon the business value of the property of its citizens, if that term may be used, because such value is readily ascertainable for reasons already stated, and that buildings built in such a manner that they cannot be resold for their fair intrinsic worth or near their actual cost will not often be constructed. In this case we have a fine, substantial, artistic building, gracing half a

block in the city of Milwaukee, built to meet the peculiar needs of its owner, and not well adapted for other uses. The state says, tax it at its sale value. It is not ultimately a question of cost, of cost of reproduction, of revenue derived from its use, of location, but of all these and of all other elements that go to determine sale value. The assessor used these elements to determine the real fair intrinsic worth of the building to one who might need it just as it is. The court used these elements in arriving at its sale value, taking into consideration the actual situation as it existed in Milwaukee at the time. The latter is the statutory rule and governs."

However, when sales are made under such circumstances that the fair market value is not obtained, the sale price is not controlling and does not conclusively fix its clear market value. *State ex rel. Flambeau Paper Co. v. Windus* (1932), 208 Wis. 583, 243 N. W. 216; *State ex rel. Collins v. Brown* (1937), 225 Wis. 593, 274 N. W. 455; *Estate of Nieman* (1939), 230 Wis. 23, 283 N. W. 452.

Where the clear market value is not established by a sale or sales, then all the facts collectively which have a bearing upon such market value are to be considered in determining it. Offers of purchase which may have been received may be considered in determining fair market value. *Rahr Malting Co. v. Manitowoc, supra,* and cases already cited. As to the factors which should be taken into consideration under such circumstances, see *State ex rel. Flambeau Paper Co. v. Windus, supra.* In addition to all these the court may receive the opinions of qualified experts.

We first come to a consideration of the circumstances under which the sale in this case was made. Mrs. Ryerson died testate on September 5, 1937. The property in question passed under her will to the University of Chicago, the Art Institute of Chicago, and the Field Museum of Natural History in Chicago. None of these institutions were in necessitous circumstances. The property was placed on the market shortly after her death. In the early part of the year 1938 the execu-

tor made vigorous efforts to find a buyer for the property. He wrote many letters, interviewed many realtors, and made personal calls on subdividers and real-estate brokers. Immediately after Mrs. Ryerson's death a price of $125,000 was fixed for the property. In the early part of 1938 the price was reduced to $100,000. In the spring of 1939, no purchaser having been found at that price, the asking price was reduced to $60,000, and thereupon the executor renewed his efforts to find a purchaser repeating what he had done in 1938. No purchaser having appeared at the fixed price of $60,000, realtors and others were requested to submit offers. W. F. Best submitted an offer of $50,000. After consideration and conference with the legatees the offer was accepted and the deal closed on April 3, 1939. The sale was made upon condition that payment of the purchase price should be distributed over a number of years. In writing the realtors in March, 1939, and in an effort to make a sale, the trustee used the following language:

"At that time [May, 1938] the trustee under the will of Carrie Ryerson was offering the property for sale at $100,000, and recently has reduced the price from $100,000 to $60,000, so that a sale of this property could be made in the near future."

Upon this statement the respondent argues that the sale was not a sale by a willing seller to a willing purchaser but partook of something in the nature of a forced sale and therefore did not reflect the fair market value. Although the property was put on the market shortly after Mrs. Ryerson's death, and vigorous efforts were made to procure a purchaser, the only prospect who ever appeared was the one to whom the sale was made in April, 1939, upon the condition that payment of the purchase price be distributed over a series of years. No doubt the executor wished to make distribution of the estate but he was under no compulsion to sacrifice the property for that

reason. In this connection it should be said that the trial court refused to receive evidence of offerings of similar property made at or about the same time. While a listing of property or offering it for sale at a certain figure does not fix its market value, no property is going to be sold for more than the price at which it is offered. It may be sold for less and often is. It is considered that the offer to show *bona fide* listings of similar property was competent upon the question of the fair market value of the property. The asking price is likely to be much better evidence of the value than mere opinion evidence based upon hypothetical situations or even actual inspection of the property by a stranger. The asking price is more likely to be higher than the market value rather than lower. The fact that over a reasonable period of time property has been publicly offered at a certain price, and efforts have been made to procure a purchaser without results, would seem to be convincing evidence that the market value was something below the asking price. Its probative value will depend somewhat upon the facts of the case in which it is offered.

Upon the trial the following witnesses testified with respect to value: William F. Trinke, in the real-estate business at Lake Geneva, testified that in his opinion the real estate in question on September 5, 1937, had a clear market value of $47,000; Alfred A. Pederson, who lived at Williams Bay, on Lake Geneva, was of the view that its market value as of September 5, 1937, was $50,900; Malcolm R. MacDonald, a real-estate analyst and appraiser with twenty years' experience, living at North Brook, Illinois, was of the view that the clear market value on September 5, 1937, was $58,000. The following witnesses were called on behalf of the state: William F. Best was one of two appraisers who appraised the property at $95,300; George Hotten, residing at Williams Bay, Lake Geneva, testified that the bulk sale value would be from $50,000 to $60,000. Walter H. Savery, a Chicago

realtor, testified that the value of the property was $120,000, and on cross-examination he said:

"In arriving at my valuation of $120,000 I have taken into account the cost that I would be put to in making and selling a subdivision. That cost is approximately one third of the retail sales price to the customer. In arriving at that value I have assumed that this property would retail over a course of 8 to 10 years at twice $120,000 if conditions remain as they are now. I would enter into such an enterprise with my own money with the conditions as they are now if I had plenty of money and was in that business."

When asked if he would have invested $110,000 or $120,000 in this property he replied: "I didn't have any money. I was broke." Such testimony is of little, if any, evidentiary value with respect to the question under consideration in this case. An estimate as to what a property will sell for over a period of eight or ten years if conditions remain the same is no basis for determining the market value at the present time. If the witness does business upon the basis indicated in his testimony, it is no wonder he was broke. Subdividing suburban property is a speculative proposition. A good man with a lead pencil can make almost as much money out of subdivisions as can be made in the same way by raising chickens.

An employee of Mr. Savery testified that in his opinion the property had a value of about $100 a front foot as of September, 1937. He also based his opinion of value upon a prospective subdivision. Lloyd Best, a realtor living in Lake Geneva, testified that in his opinion the clear market value of the Ryerson place as of September, 1937, was about $90,000. He said: "My value of $90,000 for the Ryerson property contemplates that it could be sold in parcels in two years for that figure." It is to be noted that William F. Best & Son, the witness being the junior partner, had this property for sale for eighteen months and the best offer they were able to produce for the property was $50,000. Herman Malsch

testified that in his opinion the value of the property as of September, 1937, was $87,795. He placed substantial value upon the buildings, part of which some witnesses thought should be wrecked. He based the valuation of the buildings upon cubical contents. Paul Gavin, assessor of the town of Linn, testified to the assessed valuation of the property in question and other property which was assessed, land and improvements in 1936, at $105,000.

There was testimony also respecting the cost of subdividing and the probable sale value of lots in the subdivision when made, and testimony as to the effect of delinquent taxes upon property in the vicinity and other matters which it is not necessary for us to set out. Practically every principal witness for the state, those testifying to the higher valuation, based their conclusion on prospective profits to be derived from a subdivision. That is a purely speculative value and has little, if any, relation to market value. The executor was not required to enter into the real-estate business and speculate with the property of the legatees. It was his duty to procure the best possible price for the property and make distribution of the proceeds. It appears that after the sale of the Ryerson property, Best & Son procured an offer of $7,500 for a piece of land one thousand two hundred feet in depth, having a lake frontage of one hundred feet, such property being in the southwest corner of the Ryerson property. The purchaser paid $1,000 and was given a receipt but before the transaction was completed the purchaser died. From the evidence it appears that this property was well located with reference to the lake. The bank on the west half of the property was comparatively low while on the east was a bluff. Practically all of the witnesses agree that property so located as to be little above the lake so as to make it readily accessible is much more saleable than property with high banks.

It is impossible for us to digest all of the evidence offered and received in this case. Much of it related to the experience

and skill of the various witnesses who testified as experts, a vast deal of it pertained to descriptions of comparable properties in and about Lake Geneva.

In reaching its conclusion that the fair market value of the property was $105,000 the court was misled to some extent by an erroneous view of the law. In its opinion the court said:

"Neither Martin Ryerson, nor the decedent, nor any one in their behalf, ever appeared before the town board and objected to the assessed valuation of the real estate. . . .

"Certainly no different result would obtain were the appeal to this court from the assessment upon this state of the record, the law being settled in such case that if there is any competent credible evidence to sustain the valuation placed on the property by the assessing officers, the assessment must be sustained by the court," citing *Rahr Malting Co. v. Manitowoc, supra.*

"The rule that applies as to real-estate evaluation on the civil side of the court should apply with like force and effect on the probate side for it is impossible for one tract of real estate to have two market values at the same time.

"Wisconsin has two separate sections of the statute bearing upon the use of proceedings of assessment. Section 70.49 W. R. S. reads in part as follows: 'The value of all items of real and personal property entered in the assessment roll to which such affidavit is attached by the assessor shall, in all actions and proceedings involving such values, be presumptive evidence of the full market value thereof.'

"It is provided by section 328.11 W. R. S. relating to evidence that 'all assessments . . . shall be received as presumptive evidence of the facts therein stated.'"

The court then refers to the history of these sections. Sec. 328.11, Stats., is a part of the chapter on "Presumptions and judicial notices" and is entitled "County records as to taxation," and by its terms applies only to books and files in the office of the county treasurer or the county clerk and certainly

has no application whatever to an appraisal made in the county court.

Sec. 70.49, Stats., is a part of the chapter on general property taxes and by its terms applies only to the assessment roll to which the affidavit of the assessor is attached and applies there only "in all actions and proceedings involving such values." In such cases it is made presumptive evidence of the full market value.

In *Tuckwood v. Hanthorn* (1886), 67 Wis. 326, 30 N. W. 705, this court held that under sec. 4162, Stats. 1878, now sec. 328.11, tax rolls were admissible against a party only in a proceeding to enforce the tax levied against him. The provisions of ch. 70, Stats., were rearranged and revised by ch. 427, Laws of 1931. At that time the following amendment was incorporated in sec. 70.49:

"The value of all items of real and personal property entered in the assessment roll to which such affidavit is attached by the assessor making the assessment shall, in all actions and proceedings involving such values, be presumptive evidence of the full market value thereof."

This is quoted and relied upon by the trial court to sustain an appraisal made by the county court for inheritance tax purposes. This amendment did little more than to codify the existing law upon the subject. *Worthington Pump & M. Corp. v. Cudahy* (1931), 205 Wis. 227, 237 N. W. 140, and cases cited. By its terms it applies only to actions and proceedings involving such values. "Such values" clearly refer to values of items of real and personal property as entered in the assessment roll by the assessor. So that by its very terms the statute makes the assessed value presumptive evidence only in cases where that value is under attack.

A determination made by the board of review may be reviewed by the court. However, if in any reasonable view of

it, the evidence submitted to the board furnished a substantial basis for the decision reached by it, and it acted fairly and honestly, its decision will not be disturbed by the courts. *State ex rel. Kimberly-Clark Co. v. Williams* (1915), 160 Wis. 648, 152 N. W. 450. Only jurisdictional errors are reviewable on *certiorari.* These statutory provisions, however, have no application to a proceeding in the county court to ascertain the value of property for inheritance tax purposes. In such a proceeding, as already pointed out, the rule is that a finding made by the county court must stand unless it is against the great weight and clear preponderance of the evidence.

It is evident that the court gave some weight to the fact that neither Ryerson, nor after his death, anyone representing the widow, ever appeared before the board of review and objected to the assessed valuation of the real estate. The court was of the opinion that acquiescence amounted to approval under the facts. While we are unable to say just what weight the trial court gave to this circumstance, the indications are that it weighed heavily in its consideration of the case.

That brings us to the question whether assessment rolls are competent evidence to establish value in cases other than those where they are given that effect by express provision of the statutes. The great weight of authority seems to be that in cases where the owner takes part in the assessment, as by furnishing a sworn statement of values or listing his property with valuations, assessment rolls may be admissible. It is true that in this state it is the statutory duty of the assessor to value the property in the assessment roll "at the full value which could ordinarily be obtained therefor at private sale." (Sec. 70.32 (1), Stats.) It is a notorious fact that in spite of the strenuous efforts made by the state taxing authorities for the last quarter of a century local assessments are not so made. For more than eighty years we have had state and county boards of equalization whose function it is in distributing the tax burden to equalize the valuation of districts within

counties and of counties within the state. If assessors performed their duties in accordance with the statutory commands, these boards of equalization would be unnecessary. In many districts property is overvalued, in others it is undervalued. The taxpayer is not adversely affected unless the valuation placed upon his property by the assessor is disproportionate to that placed upon other property within the taxing district. The fact that a taxpayer has not complained of his assessment is no more evidence of his satisfaction with it so far as it fixes the fair market value of his property than it is that he acquiesces in it because it is not disproportionate. Except for weighty reasons taxpayers hesitate to arouse the antagonism of taxing authorities who have it within their power to make things very uncomfortable for the taxpayer. So far as we are able to discover, a taxpayer in this state is under no duty to furnish the assessor a list of his property, real and personal, or to place values thereon. Real property and personal property are to be valued by the assessor upon actual view. (Secs. 70.32, 70.34, Stats.) However, a taxpayer may be examined under oath by the assessor as to all items of property and the value thereof. (Sec. 70.35.) To a certain extent the assessment made by the assessor is tentative. It is subject to review and revision by the board of review on its own motion. It is the duty of the assessor to attend the meetings of the board. The board has power to require the attendance of witnesses, including owners, and conduct hearings. Its findings are conclusive except that they may be reviewed for jurisdictional error. With respect to valuation of personal property, no person is allowed in any action or proceeding to question it unless his objections thereto have been first presented to the board of review and he has made full disclosure before the board of all his personal property liable to assessment in the district. (Sec. 70.47 (6).) While under the statute the valuations as fixed by the assessor and approved by the board of review thus become conclusive as re-

spects the liability of the taxpayer they are not made competent evidence or conclusive for any other purpose by statute. If a taxpayer has filed a sworn statement as to valuation of his property, real or personal, or testified before the assessor or the board of review as to its value, such sworn statements and statements made to the assessor or the board of review, may be received in evidence under practically all of the authorities. *Tuckwood v. Hanthorn* (1886), 67 Wis. 326, 336, 30 N. W. 705. See cases cited, 5 Wigmore (3d ed.), p. 552, § 1640, note 17 A. L. R. 170, and continuation of note in 84 A. L. R. 1485.

We conclude therefore that under the law of this state, the taxpayer not being required to furnish the assessor with a sworn statement describing and valuing his property, the assessment roll is not admissible for any other purpose than that prescribed by statute, but that statements made to the assessor or the board of review with respect to the description and value of his property, whether written or oral, may be received in evidence against him as an admission against interest, it being within the power of the assessor and the board of review to require the taxpayer to submit to an examination. *Tuckwood v. Hanthorn, supra.*

While it is true that neither the executor nor the residuary legatees were under any real compulsion to sell, nevertheless if no sale was made their legacies would be withheld from them and would in all probability be diminished by the expenses incident thereto. It is quite apparent upon the whole record that the parties were desirous of making a reasonably quick sale, they cut the price to $60,000 in order to accomplish that. The reduction in price failed to produce a buyer. When an offer was submitted, after consideration they accepted, no doubt making some sacrifice in order to close the estate. In the absence of more explicit evidence than is contained in the record, we should hesitate to say as a matter of law that property of this kind could be sold for its full market value within

eighteen months, especially as it appears from the record that sales are confined very largely to the months immediately preceding the summer season and that it is very difficult to move this class of property at other times.

It is our observation in many of the cases that have come before us that trial courts are inclined to give altogether too little weight to the price actually paid for property upon a fair open market. In this connection we call attention to the case of *State ex rel. Collins v. Brown* (1937), 225 Wis. 593, 595, 275 N. W. 455. In that case the relator sought to have set aside the assessment approved by the board of review upon certain real property on *certiorari*. In that case it was held that the assessor's valuation was presumptively correct. The question considered and decided by the court was whether there was sufficient evidence to overcome the presumption. The court said:

"Does the fact that this property was sold immediately after the assessment for a price materially less than the assessor's valuation so clearly establish the full value which would ordinarily be obtained at private sale as to demonstrate the incorrectness or inaccuracy of the assessor's judgment? We think not, unless such evidence is accompanied by a showing that the sale was made under such normal and usual circumstances as to lead to the conclusion that the price paid was that which ordinarily could be obtained at private sale. The relations and circumstances of the parties, as well as the purpose of the sale, have an important bearing upon this question. Other circumstances not here named may demonstrate that the sale was a normal and usual one, and give such probative force to the price paid as to compel the conclusion that the assessor's valuation was incorrect."

It was held that the plaintiff had not sustained this burden. While this was said in reference to a valuation made by an assessor, which the relator sought to set aside, it is considered that in all cases parties who rely upon sales to establish fair market value, should bear the burden of establishing that the

sales were made by a person willing to sell but not obliged to sell to a willing buyer who was not obliged to buy, together with such other circumstances as indicate that the price was fairly obtained in an open market.

A value based on what may be made by a subdivision of the property is a purely speculative value. What a purchaser is willing to pay for it in the open market is evidence of market value. The value of property for some special purpose, or what it cost to produce it, or what its intrinsic value is, does not determine market value. This property was open to purchase by realtors and subdividers for at least eighteen months. No one willing to purchase appeared. Experience showed that sale would in all probability have to be postponed for another year with no certainty that it would be made then. The minds of reasonable men may come to different conclusions as to the character of the sale made in 1939. If it did not sell for full value, the circumstances surrounding the sale strongly preponderate in support of the conclusion that its clear market value was substantially less than its assessed valuation. For that reason it is apparent that it should have been given much more weight than the trial court gave it.

Upon the whole case, it is considered that the order should be reversed, and the cause remanded to the trial court for further proceedings.

*By the Court.*—It is so ordered.