ESTATE OF GOODING : WISCONSIN VALLEY TRUST COMPANY, Executor, Appellant, vs. DEPARTMENT OF TAXATION, Respondent.

*March 10—April 5, 1955.*

498

500

For the appellant there was a brief by *Smith, Okoneski, Puchner & Tinkham* of Wausau, and oral argument by *R. E. Puchner*.

For the respondent there was a brief by the *Attorney General* and *Harold H. Persons* and *E. Weston Wood*, assistant attorneys general, and *Neil Conway*, inheritance tax counsel, and oral argument by *Mr. Persons* and *Mr. Conway*.

CURRIE, J.   The appellant executor advances the following three contentions on this appeal:

(1) Certain sales of shares of stock of the Wisconsin Box Company conclusively establish the fair market value of the stock in said company owned by the deceased at the time of his death on May 3, 1952, at $100 per share.

(2) If such sales are held not to be conclusive in establishing such market value, the trial court's determination of a value of $140 per share is excessive as being against the great weight and clear preponderance of the testimony.

(3) The trial court committed prejudicial error in failing to give any weight to the restrictive agreement relating to the sale of testator's stock as embodied in testator's will, in valuing said stock.

But one issue is presented by the state's motion for review and that is whether the great weight and clear preponderance of the evidence requires a valuation of this stock at a value of at least $165 per share.

Sec. 72.01, Stats., relating to inheritance taxes, provides in sub. (8) that the tax so imposed shall be upon "the clear market value" of the property; secs. 72.13 and 72.14 require

that appraisals be made at the "fair market value;" sec. 72.15 (1), (3) provides that the court shall determine the "cash value" of the property; and sec. 72.15 (5) states that the property shall be appraised at "its clear market value."

This court in *Estate of Ryerson* (1941), 239 Wis. 120, 124, 300 N. W. 782, held that the terms "fair market value," "cash value," and "clear market value" are for all practical purposes identical. The United States supreme court, in *United States v. Miller* (1943), 317 U. S. 369, 63 Sup. Ct. 276, 87 L. Ed. 336, in considering whether there was any distinction between "market value" and "fair market value," stated (p. 374) :

"The term *'fair'* hardly adds anything to the phrase *'market value,'* which denotes what 'it fairly may be believed that a purchaser in fair market conditions would have given,' or, more concisely, 'market value fairly determined.' " (Emphasis supplied.)

In *Estate of Ryerson, supra,* this court declared (p. 125) :

" 'Market value' is a term frequently used not only in the statutes of this state but in that of many other states. It has been defined by this court as follows: Clear market value is the sum which property would bring on a fair sale when sold by a willing seller not obliged to sell to a willing buyer not obliged to buy. *Allen v. Chicago & N. W. R. Co.* (1911), 145 Wis. 263, 266, 129 N. W. 1094; *Rahr Malting Co. v. Manitowoc* (1937), 225 Wis. 401, 274 N. W. 291."

If actual sales of the stock of the Wisconsin Box Company had taken place in close proximity to the date of death of the deceased, which met such stated test of having been made by a willing seller not obliged to sell to a willing buyer not obliged to buy, the sales price of such sales would be controlling and it would have been error for the learned trial court to have disregarded the same and based his determination of the value upon the testimony of expert witnesses basing their conclusions on such items as the average earnings,

history of dividend payments, book value, and other factors. However, when sales are made under such circumstances that the fair market value is not obtained, the sales price is not controlling and does not conclusively fix its clear market value. *State ex rel. Flambeau Paper Co. v. Windus* (1932), 208 Wis. 583, 243 N. W. 216; *State ex rel. Collins v. Brown* (1937), 225 Wis. 593, 275 N. W. 455; *Estate of Nieman* (1939), 230 Wis. 23, 283 N. W. 452; *Estate of Ryerson, supra,* at page 127.

With these principles in mind we will now turn to an examination of the actual sales relied upon by the appellant executor. The two chief sales stressed by the appellant are those made by Mrs. Marie Hagedorn and by the Woodson family.

On February 1, 1949, Wisconsin Box Company purchased 255 shares of its capital stock from Mrs. Hagedorn at a price of $100 per share. She had inherited this stock from her father, who died April 2, 1948, and who, for many years, had been superintendent of the company's plant and a stockholder. At the time of the sale she was a mature woman fifty years of age residing in Iowa. She had no financial obligations making it necessary for her to sell; in fact, she had inherited $93,000 in assets from her father. She received an offer from the company to sell this stock which she had inherited at the value at which it was appraised in her father's estate of $100 per share, which was also the par value of the stock. She then consulted Attorney E. P. Gorman of Wausau, who had known her for many years and had drawn her father's will and probated the estate, and requested his advice whether to accept the offer. Attorney Gorman advised her to accept the company's offer. He testified that he had not gone into the financial statements of the company and in talking with Mrs. Hagedorn did not discuss book value.

Apparently his advice to sell was based on the fact that the company was a closely held corporation.

The Woodson sale took place on August 21, 1953, approximately fifteen months after date of death of testator. Five members of the Woodson family owned an aggregate of 150 shares of stock of the Wisconsin Box Company, and in May, 1953, Mr. A. P. Woodson, one of the five, consulted Mr. Paul J. O'Brien, manager of the Wausau office of the Robert W. Baird & Company, about selling such 150 shares of stock. Mr. O'Brien had been one of the three court-appointed appraisers who had placed a value of $100 per share on the stock, and he told Woodson of such fact, that the taxing authorities were insisting on a higher valuation, and that a hearing was to be held on the issue. Woodson replied that the $100 was "a good price" and that he would sell his stock at such price. O'Brien did not take the matter up with the officers of the Wisconsin Box Company right away but delayed until July. Then such officers did not accept immediately and the sale was not consummated until August 21, 1953. This stock had been owned by the Woodsons for many years and they were not in any financial position requiring them to sell.

Testimony was also received of sales made much more remote in time to the date of death of testator than the Hagedorn and Woodson sales. In 1942, the deceased and his brother had purchased 100 shares from the F. O. Crocker estate for $3,729.75, or approximately $37.30 per share. On February 12, 1944, one J. D. Mylrea purchased 60 shares at $50 per share from a bank which had held the stock as collateral. In 1943, seven shares had been purchased by Mr. H. G. Beck, president of the Wisconsin Valley Trust Company, from a trust at $25 per share along with some other "odds and ends."

However, because of the remoteness in time, of all sales other than those made by Mrs. Hagedorn and the Woodson family, we will confine our consideration to these two sales. Neither Mrs. Hagedorn nor the selling agent for the Wood-

sons attempted to contact any prospective purchaser other than the Wisconsin Box Company in an attempt to sell their stock. The record is also entirely silent whether there were any persons in the market for stock of such company at the time such sales were made, except the company itself.

In *Estate of Nieman, supra,* the trustees of the Nieman estate sold the controlling stock of the Journal Company, which published the Milwaukee Journal and operated radio station WTMJ, in one transaction to the Journal Company and a Miss McBeath at a price of $3,500 per share, and contended that this sale fixed the price as of the date of death of testator for inheritance-tax purposes. In rejecting such contention, this court stressed the fact that the only offer considered or sought by the trustees was that of the Journal Company and Miss McBeath, and the court upheld the valuation of $4,500 per share determined by the trial court.

We are constrained to conclude that sales price evidenced by sales made to a corporation of its own stock, even though made by willing sellers not obliged to sell, is not conclusive in determining the fair market value of such stock in a situation where the corporation is the only person or entity contacted by the seller as a prospective purchaser. In a situation where there are no prospective purchasers other than the corporation itself, it lies within the power of the executives of the corporation to control the selling price by refusing to buy at any figure other than an arbitrary one fixed by themselves. While we hold that such sales to the corporation are not conclusive on the issue of market value, they, nevertheless, may be accorded some weight by the trier of fact in those situations where the sales are made by willing sellers not obliged to sell.

Inasmuch as it was not error for the learned trial court to disregard the Hagedorn and Woodson sales as being controlling on the issue of market value, we are faced with the problem of determining whether the court's determination

of a value of $140 per share is contrary to the great weight and clear preponderance of the evidence. The appellant executor urges that the weight of the evidence will not sustain a valuation that high; while the state contends that at least $165 per share is the lowest value which will accord with the great weight of the evidence. These contentions make it necessary for us to review much of the pertinent evidence adduced upon the hearing below.

The Wisconsin Box Company was founded by the father of testator and incorporated in 1900. Its business, in its early years, was the making of nailed-up boxes out of softwood, mostly pine, which it sold to other manufacturers who packaged their products in such boxes. The company at one time had owned 16,000 to 20,000 acres of timber as its source of softwood in northern Wisconsin, but the last of these timber holdings was liquidated by 1921. The company then changed its production to wire-bound boxes, which may be briefly described as a box with completed ends and thin resawed hardwood of a low grade, $\frac{1}{8}$ to $\frac{1}{4}$ of an inch in thickness, held together by wires and staples, constituting the sides of the container. All are shipped flat and the wire-bound sides are wrapped around and nailed to the ends by the purchaser, thereby making containers for the shipment of large and small, light and heavy, goods.

The company's production represents approximately two per cent of the wire-bound boxes manufactured and sold in the United States. The company's largest competitor in the wire-bound-box business is the General Box Company which has plants in Wisconsin and other states. In recent years there has been a trend toward the use of corrugated and fiber paperboard containers being used for packaging manufactured products. Such latter type of containers is now being made so strong that they can even package heavy objects such as stoves and refrigerators, and the company has suffered from such competition and has lost some customers who have

changed over from the wire-bound wood boxes to these corrugated or fiber paperboard containers.

The average earnings per share on the outstanding stock of the Wisconsin Box Company have been as follows:

1930 to 1952, inclusive (23 years)..........$10.94
1940 to 1952, inclusive (13 years)..........  21.06
1948 to 1952, inclusive ( 5 years)..........  27.81

The company has used a fiscal year ending April 30th, instead of a calendar year, for accounting and tax purposes. The net earnings per share of the company for the last five fiscal years preceding testator's death were as follows:

*Year ending*

April 30, 1952........$19.03
April 30, 1951........ 25.61
April 30, 1950........ 11.52
April 30, 1949........ 38.93
April 30, 1948........ 43.97

The average dividends paid per share during the last ten years preceding testator's death were $15.39 per share; and such dividends averaged on a five-year basis amounted to $19.20 per share per year. During the last five years preceding death the dividends paid per share were as follows:

1952............$15
1951............ 20
1950............  8
1949............ 28
1948............ 25

The book value per share of the company's stock as of April 30, 1952, was $192. The company had no noncurrent liabilities, and, on the basis of subtracting current liabilities from current assets and dividing by the number of outstanding shares, the net-asset book value of the stock was $162 per share as of April 30, 1952. The $30 difference per share between such figures of $162 and $192 represents the part of

the book value per share attributable to fixed assets, consisting chiefly of land, buildings, machinery, and equipment. Testimony was adduced to the effect that such fixed assets were undervalued on the books. However, this fact is probably true of most corporations in 1952, because fixed assets are usually carried on corporate books at original cost less depreciation, and at the time such assets were acquired the value of the dollar was much greater than in 1952.

The appellant executor's expert witness on value was Mr. Edwin Van Horn, a security analyst who has been associated with Robert W. Baird & Company of Milwaukee engaged in the investment-securities business, while the state's expert witness was Mr. Richard E. Williams, who has been employed as an accountant with the Wisconsin department of taxation for the past thirteen and one-half years. Mr. Williams is a certified public accountant and is also a member of the Wisconsin bar. The impression gained from reading the testimony given by these two expert witnesses is that both are highly competent in their respective fields.

Both Van Horn and Williams acknowledged that, in seeking a corporation whose stock was listed on one of the stock exchanges with which to compare the stock of Wisconsin Box Company for valuation purposes, General Box Company best served such purposes, inasmuch as it was a competitor engaged in the same line of business. Both witnesses based their conclusions as to value to a considerable extent on comparisons made between these two corporations.

The annotation in 117 A. L. R. 143, at page 153, states, that in determining the market value of capital stock in a close or family corporation, where there are no controlling sales, among the factors properly to be considered are earnings or losses, dividend-payment record, book value, and future prospects of the corporation. Sec. 2031 (b) (1954) of the Internal Revenue Code (which is substantially sec. 811 (k), 1939 code unchanged), provides as follows:

"In the case of stock and securities of a corporation the value of which, by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange."

It was pointed out in *Colonial Trust Co. v. Kraemer* (D. C. Conn. 1945), 63 Fed. Supp. 866, 870, that sec. 811 (k) of the former Internal Revenue Code, providing for such comparison, embodied a test which was well recognized prior to its enactment. We are of the opinion that such test of comparing a stock of the close corporation to be valued with the stock of corporations engaged in the same line or similar line of business which are listed on an exchange is an excellent one which should be applied, if comparative data is obtainable, in arriving at values in situations such as presented in the instant case.

Among the data relating to the stock of the General Box Company considered by the witnesses Van Horn and Williams in their testimony are the following statistics:

Selling price per share on exchange as of date of
death of testator.............................$ 2.25
   Book value per share as of said date............ 3.53
   Average net income per share during the five years
preceding death of testator...................... 42.8¢
   Average net income per share during the ten years
preceding death of testator...................... 32.4¢
   Average cash dividends paid per share during said
five-year period................................ 13.8¢
   Average cash dividends paid per share during said
ten-year period................................. 10.5¢

Earnings per share during five-year period preced-
ing testator's death:

1951 ........................................ 45¢
1950 ........................................ 40¢
1949 ........................................ 3¢
1948 ........................................ 51¢
1947 ........................................ 75¢

Ratio which market value bore to book value as of
end of accounting year closest to testator's death....63.7%

Such market price of $2.25 per share equals 5.26 times the
42.8¢ average earnings per share based on the five-year
average shown above.

The two expert witnesses, Van Horn and Williams, ar-
rived at radically different valuations of the stock of Wis-
consin Box Company as the result of comparisons made by
them in using the foregoing comparative data relating to
the listed stock of the General Box Company, Van Horn's
valuation being $90 per share, while Williams arrived at a
value of $193.75. It seems almost beyond belief that two
competent witnesses could use the same statistical data of the
two corporations and arrive at two such widely separated
valuations. While the memorandum opinion of the learned
trial judge does not indicate that he averaged the two values
of $90 and $193 per share in arriving at his determination
of $140 per share, it is interesting to note that such a method
would have produced a result of $141.50 per share.

Williams, in making his comparisons between stock of the
Wisconsin Box Company and General Box Company, did
so on the basis of comparing the three factors of average
earnings, book value, and average dividend payments. First
he capitalized the earnings of Wisconsin Box Company by
multiplying $27.75, the company's approximate average net
earnings figure based on the last five years preceding death
of testator (actually $27.81) by 5.26, the ratio which the
market price of General Box Company stock bore to its
average annual earnings averaged over a like five-year pe-

riod, arriving at a figure of $145.97. He also applied the ratio which the market price of General Box Company stock bore to its book value of 63.7 per cent and multiplied Wisconsin Box Company's book value of $192 per share by such percentage, obtaining thereby the figure of $122.31. Inasmuch as the market price of General Box Company stock was 16.3 times its average cash dividends, computed on the five-year basis, he multiplied Wisconsin Box Company's average cash dividends of $19.20 per year for the last five years preceding testator's death by such figure of 16.3, arriving at the sum of $312.96. Then he added the resulting figures of $145.97, $122.31, and $312.96 together, the total being $581.24, and divided this by three to arrive at his comparative value per share for the stock of the Wisconsin Box Company of $193.75.

In making an analysis of the foregoing method pursued by Williams in arriving at a value per share of Wisconsin Box Company stock based upon a comparison of the General Box Company data, two significant facts are highlighted. First, Williams' method gives equal weight to the three factors of earnings, book value, and dividend payments. Secondly, it is the capitalization of dividends which alone accounts for the apparently high value of $193.75 per share. If but the factors of average earnings and book value were taken into consideration and averaged on an equal basis, the resulting value of Wisconsin Box Company stock would be but $134.14 per share. This suggests that the factor of dividend payments by Wisconsin Box Company should be further analyzed from two standpoints: First, as to why there is the wide discrepancy in the proportion of average net earnings paid out as cash dividends by the two companies; and, secondly, whether the reason ascertained for such discrepancy requires that the factor of comparative dividend payments be largely discounted in arriving at a comparative market value of Wisconsin Box Company stock.

Between 1941 and 1951 the fixed property account of General Box Company increased 237 per cent. On the other hand, as of April 30, 1942, the fixed assets of Wisconsin Box Company were $185,500 less a depreciation reserve of $107,700, or a net of $77,800; while on April 30, 1952, the gross fixed assets were down to $66,100 and the depreciation reserve was down to $33,700, for a net of $32,400. In other words, General Box Company had greatly increased its investment in manufacturing facilities by ploughing back earnings, while Wisconsin Box Company had actually retired fixed assets in the last ten years so that it did not need to retain any of its net earnings for the purpose of investing the same in further production facilities.

From the standpoint of future income an investor might well consider that a company which was ploughing back earnings in the business in order to increase future earnings had a brighter future and better earning position than one whose plant facilities had remained stationary. Other significant facts are that the average dividend payments by Wisconsin Box Company for the last five years preceding testator's death were $19.20 per share, while the company only earned $19.03 per share in the fiscal year ending April 30, 1952; and in the fiscal year ending April 30, 1953, during which testator's death occurred, such net earnings were but $19.28 per share. In view of all this, we conclude that, while dividend payments are a proper factor to be considered in valuing the stock in question, the trial court might well have concluded that it should not be accorded equal weight with the factors of average earnings and book value in determining a comparative market value based upon the General Box Company data. In fact, in arriving at such comparative value there is no rule of law requiring that any particular factor be given equal weight with another factor.

Van Horn approached the comparative-valuation problem by testing his result of $90 per share of value for the stock

of the Wisconsin Box Company against what an investor would receive if he were to invest $100 in each of the two companies on the basis of paying $90 per share for the Wisconsin Box Company stock, and $2.25 per share for General Box Company stock. For such $100 invested in Wisconsin Box Company stock such investor would receive $213 of book value, while for the same amount invested in the General Box Company he would receive $157.30. On the basis of five-year average earnings, such investor would receive $30.39 per year from Wisconsin Box Company as compared to $21.80 per year from General Box Company; but on the basis of the 1951 earnings this investor would receive $20.68 for the money invested in Wisconsin Box Company and $24.95 for that invested in General Box Company. It would thus be seen from these three comparisons that the advantage of the first two lay in the money invested in Wisconsin Box Company, while only in the last-mentioned respect was the advantage with the General Box Company.

However, Van Horn stressed the lack of aggressive management of Wisconsin Box Company as evidenced by the fact that during the ten years preceding the testator's death, General Box Company had increased its fixed property account by 237 per cent, while during the same period Wisconsin Box Company had actually retired plant facilities. Another factor on which he placed great reliance was the fact that while the five-year average earnings of General Box Company were $27.81 per share, they had declined from $43.97 for the fiscal year ending April 30, 1948, to $19.03 per share during the fiscal year ending April 30, 1952. He pointed out that while two stocks might have the same average annual earnings computed on a five-year basis, one might have declining earnings, while the earnings of the other might be fairly steady or increasing, in which latter case it stood to reason that the market value of the latter stock is greater than that of the former. Still another factor which

Van Horn considered unfavorable for future prospects of the company was its aggregate sales. Wisconsin Box Company's total sales for the fiscal year ending April 30, 1952, were but 117.3 per cent of those of the fiscal year ten years before, while during the same ten-year period the sales of General Box Company had increased 42 per cent compared to Wisconsin Box Company's 17 per cent. Van Horn did not consider the prospects of future earnings of the company to be good because of these factors and the increasing competition from manufacturers of paperboard containers.

In view of the foregoing summary and analysis of the testimony of Williams and Van Horn, we have a situation in which Williams applied a comparative formula that weighted net earnings, book value, and dividend payments equally and gave no consideration to the future earning prospects of the company which might materially adversely affect future dividend payments. On the other hand, Van Horn accorded great weight to the factors that were likely to result in lessened earnings for the company, and, apparently, accorded no weight whatever to the large past dividend payments of the company. The trial court may well have concluded that the true market value of this stock lay somewhere between the extremes in value as testified to by these two expert witnesses.

With respect to the appellant executor's contention on its appeal, that the $140 value placed upon the stock of the Wisconsin Box Company by the trial court is excessive, it is our conclusion that such value is not against the great weight or clear preponderance of the evidence. It is true that no witness testified to a value of $140 per share. However, in *Estate of Nieman, supra,* this court pointed out, at page 37 of its opinion therein, that it was permissible for the trial court to fix the value of the Journal Company's stock anywhere between the low and high values testified to. Such principle is equally applicable to the facts of the instant case.

The appellant executor has also urged that it was prejudicial error for the trial court not to have taken into consideration, in arriving at his $140 per share valuation, the effect of the restrictive agreement entered into between the deceased and his brother, Donald R. Gooding, under date of March 11, 1950, and the clause inserted in testator's will carrying out such agreement, whereby the trustees of testator's estate were prohibited from making sale of testator's stock without first obtaining the written consent thereto of the brother, Donald R. Gooding. At the time of the hearing Donald R. Gooding was sixty-five years of age, so that his age at the time of testator's death was sixty-four years. According to the American Experience Table of Mortality (sec. 314.07, Stats.), his life expectancy was therefore 11.67 years. There has been no showing made that the agreement of March 11, 1950, was entered into for any purpose of depressing the value of the stock in the Wisconsin Box Company owned by the two brothers for inheritance-tax purposes, nor could such inference be reasonably drawn from any of the evidence in the case. We, therefore, assume that it was an agreement entered into in good faith in order to insure that neither brother, during his lifetime, nor his trust estate after his death, would be placed in a minority stockholder's position as a result of the other brother, together with the holders of the remaining stock, selling to an outsider. The provision in the will carrying out such agreement may well have had some depressive effect on the market value of testator's stock inasmuch as the surviving brother has the right to refuse to consent to a sale that the trustees of testator's estate might like to make to an outsider attempting to buy a controlling stock interest by acquiring the stock of the estate together with that of other stockholders, exclusive of Donald R. Gooding.

Randolph E. Paul, the noted authority on federal taxation and the author of Federal Estate and Gift Taxation, states

in the 1946 Supplement to such work, p. 785, sec. 18.34, as follows:

"Since the original edition of this work the law dealing with the effect of restrictive agreements upon value has become less clear even than it was in 1941. Unrest has developed, and the subject is in a state of flux which may be settled only by 'the process of inclusion and exclusion, so often applied in developing a rule' of law, especially where it is left to the courts in tax cases.

"It was noted in the original edition, 'in warning against wishful thinking,' that restrictions do not operate of and by themselves to deprive stock of market value, and it was pointed out that a restriction between private parties might not impair the right of the government to collect taxes upon actual value. The tendency of legal development is now in this direction. While restrictive agreements may be taken into consideration in fixing market value, and sometimes may control by themselves, other factors of valuation are generally relevant. A restriction is a factor to be considered, but it may do no more than depress value. The answer in the ordinary case must be a judgment which takes cognizance of every factor."

We have given some consideration to whether we should reverse and remand the proceedings to the trial court to make a new determination of value taking into consideration any depressive effect on market value which the restrictive agreement may have had, in view of the positive statement of the learned trial judge in his memorandum opinion that he did not accord any weight to such agreement. However, because the depressive effect of such agreement on market value is so nebulous, and appellant failed to offer any evidence which would afford a guide to the trial court in valuing such depressive effect, we are constrained to hold that if error was committed in this respect it was not prejudicial.

This brings us to consideration of the question raised by the state's motion for review. The attorney general urges

that the evidence establishes a value of at least $165 per share for the testator's stock.

The argument in support of such contention is largely based on the assumption that the corporation could be liquidated to pay out in excess of $165 per share because the current-asset value alone at the time of death was $162 per share. The fallacy in this argument is that testator's stock interest in the corporation is a minority interest, and there is no way that the beneficiaries of the trust estate can compel a liquidation. Two of the three trustees are salaried executives of the corporation, one of whom also owns in his own right an equal number of shares of stock to those owned by the trust. Their interest undoubtedly lies in continuing the manufacturing operations of the company rather than liquidating it.

A determination of fair market value cannot be based upon the liquidating value where the owner is in no position to force a liquidation. *Laird v. Commissioner of Internal Revenue* (3d Cir. 1935), 85 Fed. (2d) 598; *Weber v. Rasquin* (2d Cir. 1939), 101 Fed. (2d) 62; *Blackard v. Jones* (D. C. Okla. 1944), 62 Fed. Supp. 234; *Colonial Trust Co. v. Kraemer* (D. C. Conn. 1945), 63 Fed. Supp. 866; and *Goss v. Fitzpatrick* (D. C. Conn. 1951), 97 Fed. Supp. 765.

The case of *Laird v. Commissioner of Internal Revenue, supra,* involved the valuation for federal estate-tax purposes of stock of two family or close corporations, a large part of whose assets consisted of stock of high-grade listed securities, such as that of E. I. du Pont de Nemours & Co. The commissioner valued the stock of the two close corporations by taking the median between the high and low points of the sales of the securities held in the portfolios of such two companies on the date of death of testator. The court of appeals held that this was improper and reversed, and stated (85 Fed. (2d) 601):

"The stock in these two close corporations could not have been sold on the day of Mr. Laird's death, for no one could have forced the sale of all the stock constituting the assets of the Christiana and Delaware companies. At least, the executor of Mr. Laird's estate could not have done it."

The argument advanced by the state, in our opinion, gives undue weight to book value. Randolph E. Paul, in 2 Federal Estate and Gift Taxation, p. 1297, sec. 18.33, states:

"The capital stock of a corporation, its net assets, and its shares of stock are entirely different things. The value of one bears no fixed or necessary relation to the value of the other. This is particularly true as to minority interests in a closed corporation; such interests are usually worth much less than the proportionate share of the assets to which they attach."

In *Cochran v. Commissioner* (1948), 7 TCM 325 (CCH), the commissioner had valued stock of a close corporation at approximately the net current-asset value of such stock, thus taking the same position contended for by the attorney general on this appeal. The tax court held such method of valuation was excessive and quoted the above extract from Paul's Federal Estate and Gift Taxation in support of such holding. It also pointed out that stock in a close corporation lacks marketability, and in making a comparison between such stock and a listed stock in arriving at value it is proper to make some deduction for this inasmuch as investors will pay more for a listed stock than an unlisted one having identical factors of earnings, dividend payments, and book value.

We conclude, therefore, with respect to the state's motion for review, that the weight of the evidence does not require a valuation of at least $165 per share.

It might be noted that most of the authorities cited in this opinion, exclusive of the decisions of this court, deal with the valuation of stocks for purposes of federal estate and

gift-tax purposes. However, the yardstick for determining value for purposes of federal estate and gift tax is identical with that for determining value under our Wisconsin inheritance-tax statutes, viz., market value. Therefore, while this court is free to refuse to follow such authorities, including federal court decisions, in passing on questions of valuation arising under our Wisconsin inheritance-tax statutes, we do consider those cited herein to possess such merit as to be entitled to the weight we have accorded them.

*By the Court.*—That portion of the order appealed from is affirmed.