KANSAS CITY STAR COMPANY, Respondent, v. DEPARTMENT OF TAXATION, Appellant. [Two cases.]

*November 2—December 1, 1959.*

448

For the appellant the cause was argued by *E. Weston Wood,* assistant attorney general, with whom on the brief were *John W. Reynolds,* attorney general, and *Harold H. Persons,* assistant attorney general.

For the respondent there was a brief by *Frederic Sammond* of Milwaukee, *Henry N. Ess, Russell W. Baker,* and *Robert B. Olsen,* all of Kansas City, Missouri, attorneys,

and *Fairchild, Foley & Sammond* of Milwaukee, and *Watson, Ess, Marshall & Enggas* of Kansas City, Missouri, of counsel, and oral argument by *Mr. Frederic Sammond* and *Mr. Baker.*

CURRIE, J.    Secs. 71.01 and 71.07 (2), Stats., provide in part as follows:

"71.01 There shall be assessed . . . and paid a tax on all net income as hereafter provided, . . . by every non-resident of the state, upon such income as is derived from property located or business transacted within the state."

"71.07 (2) Persons engaged in business within and without the state shall be taxed only on such income as is derived from business transacted and property located within the state."

The term "person" includes corporations.    Sec. 71.02, Stats.

In a case of intracompany transfer across Wisconsin boundaries, the price attached to such transfer is crucial in determining the Wisconsin income subject to tax.    There is no statute which specifically provides how such price is to be determined.    We do have sec. 71.11 (7) (a)[1] which covers a situation where there are transfers made between subsidiary and parent corporations or affiliated corporations. Here we are not faced with a transfer between two different corporations but one occurring within a single entity.

Such sec. 71.11 (7) (a), Stats., was originally enacted as sec. 71.25 in 1925, after the intercorporate transfers had

---

[1] ". . . where a corporation, a substantial portion of whose capital stock is owned either directly or indirectly by another corporation, acquires and disposes of the products of the corporation so owning a substantial portion of its stock in such a manner as to create a loss or improper net income, the department may determine the amount of taxable income to such corporation for the calendar or fiscal year, having due regard to the reasonable profits which but for such arrangement or understanding might or could have been obtained from dealing in such products, goods, or commodities."

occurred which were the subject of the controversy before the court in *Cliffs Chemical Co. v. Wisconsin Tax Comm.* (1927), 193 Wis. 295, 302, 214 N. W. 447. The taxpayer in such case contended that this statute should not be applied retroactively. In partial answer to such argument the court stated, "The legislature, in passing the law, merely directed the tax commission to conform to a method which would have been their duty to adopt without the act."

We are satisfied that the same test of price of transfer is to be applied between intracorporation transfers, such as we have in the instant appeal, as in the case of intercorporation transfers governed by sec. 71.11 (7) (a), Stats. Furthermore, there is no room for doubt but that such test is one of fair market value.

That fair market value is the proper test to apply is made clear by the opinion of this court in *Standard Oil Co. v. Wisconsin Tax Comm.* (1929), 197 Wis. 630, 223 N. W. 85. The plaintiff taxpayer was a foreign corporation doing business both within and without the state. Its Wisconsin business consisted of operating filling stations and maintaining storage tanks to supply its Wisconsin and Minnesota stations. The tax commission assessed the income tax due on the Wisconsin operations by apportionment of the company's total net income using a weighted ratio involving tangible property, cost of sales, and sales factors within and without the state. The position of the taxpayer in opposing such method of computing the tax is best stated by quoting from the court's opinion (p. 634):

"The plaintiff contends that its income should be ascertained by the allocation and separate accounting method by which the Wisconsin business is charged *at the market price* with all products received by it, with the expense of transacting the business, including a proper allocation of general or overhead expenses and office accounting; there should be credited to Wisconsin the gross amount received from sales

of goods within the state, and that the difference constitutes the taxable income of the plaintiff company." (Emphasis supplied.)

This court sustained such contention of the taxpayer, thus putting its stamp of approval on valuing intracorporation transfers at market prices for purposes of income taxation.

The terms "market price," "market value," "fair value," "fair price," "fair market price," and "fair market value" are synonymous and interchangeable. These terms are generally interpreted to mean the price at which the goods would change hands between a seller willing but not compelled to sell, and a buyer willing but not compelled to buy. *Estate of Gooding* (1955), 269 Wis. 496, 502, 69 N. W. (2d) 586, and *Estate of Ryerson* (1941), 239 Wis. 120, 125, 300 N. W. 782. Both the taxpayer and the department agree as to the correctness of such definition but differ radically upon its application to the facts of this appeal.

The department contends that such test of fair market price must be applied to the peculiar situation in which the seller and buyer were placed at the time of transfer. From this premise it proceeds to argue that no seller of newsprint in the position of Flambeau, willing but not compelled to sell, would sell its product at a price less than cost plus a fair profit. One answer to this contention is that, if Flambeau had any choice in the matter, it would not have sold any newsprint because of its slow-speed machinery and resulting high cost of manufacture, but would have continued to make and sell high-quality paper at a good profit.

The test of fair market price is completely objective and has no reference to the peculiar position of the particular seller making the sale. We consider apposite the following statement appearing in *Sloan v. Baird* (1900), 162 N. Y. 327, 330, 56 N. E. 752, 753:

"The market value of property is established when other property of the same kind has been the subject of purchase

or sale to so great an extent and in so many instances that the value becomes fixed."

Both the board of tax appeals and the circuit court declared in their memorandum decisions that the gray-market prices, which the Star paid for a portion of its newsprint during 1948 to 1951, were no criterion of fair market prices. This is because the Star was not in the position of a buyer willing but not compelled to buy; it was compelled to buy. The same is true of the $20 per ton bonus that the Star was compelled to pay to M. & O. for the additional 10,000 tons supplied in 1948 over and above the contract quantity of 30,000 tons.

However, over 98 per cent of the newsprint consumed in the United States during 1948 to 1951 was sold at prevailing base prices. The undisputed testimony of an expert in the field, together with documentary evidence substantiating the same, established what such prevailing base prices were throughout such four-year period. While it is true that the newsprint so sold moved under long-term contracts, *such contracts fixed quantities and not prices*. The seller mills had it within their control to raise prices during the contract period in question.

Undoubtedly the mills were restrained from raising them further than they did by the fear that, if these prices were unreasonable, they might later end up losing their customers when the emergency was ended by new newsprint-producing mills entering the field. However, we do not believe this self-imposed restraint prevented the mills from being considered in the legal sense to be willing sellers at the prices which they received for their newsprint during this period. It is highly unlikely such prices thus fixed *ex parte* by the selling mills were lower than the mills believed that the purchasers would be willing to pay in a free and open market.

On the other hand, in one sense, the purchasers were not willing buyers not compelled to buy. This is because the shortage in the total supply of newsprint on the market com-

pelled them to buy, irrespective of any provisions of their contracts specifying minimum tonnages. This factor is a most-persuasive argument as to why such prevailing base prices, under which more than 98 per cent of all newsprint in the nation was sold during 1948 to 1951, were not lower than fair market prices. However, where 98 per cent of a product moves at certain prices, most of it in arm's-length dealing, there would necessarily have to be a most unusual fact situation present to enable a court to declare that such prices were not fair market prices.

It is our considered judgment that such prevailing base prices must be held to be fair market prices. Inasmuch as the taxpayer used such prevailing base prices in pricing the transfers to itself of the newsprint supplied by Flambeau, there are no further income or privilege dividend taxes due, and the taxpayer's petitions to the department to abate the additional assessments here involved should have been granted.

*By the Court.*—The judgments are reversed with directions that the circuit court set aside the orders of the board and remand the proceedings to the board with directions to enter a proper order vacating the assessments of additional tax.

FAIRCHILD, J. (*dissenting*). The taxpayer carries on a profitable newspaper publishing business. Its activities occur principally in Missouri, but in the years in question, it used raw materials which it had produced in Wisconsin. The problem is to allocate some portion of its net income to business transacted and property located within Wisconsin. The parties agree that the separate accounting method was to be used, and thus one of the determining factors in the allocation will be the "price" at which newsprint produced in Wisconsin and used in Missouri was reflected in the separate accounting. The principle relied upon by the majority

is that if a Wisconsin operation be credited with the fair market value of the goods which a taxpayer produces here, but uses in another state, a fair allocation of the taxpayer's net income to business activity in Wisconsin will result. It seems clear, however, that in the situation before us, the use of the "prevailing" price does not produce a fair allocation. It results in too much income being allocated to the business in Missouri, and too little to the business in Wisconsin.

This is not to criticize the principle above referred to, but to state that the principle cannot be applied where the conditions of the market are such as described in this record. It appears that during the particular years those newsprint producers who wished to remain in that business and who sold newsprint upon the basis of the long-term contracts were willing to sell at the "prevailing" prices. There were other producers who were willing to do business on a short-run basis and not willing to give price consideration to customers in order to maintain the relationship during future years when supply might be in better balance with demand. These producers made sales at the so-called "gray market" prices, ranging much higher than the "prevailing" prices. Under the market conditions described, it seems to me to be impossible to determine a market price which would be useful in solving the problem before us. Evidently, a producer was a willing seller at the "prevailing" price if he wished to play the game on a long-term customer-relationship basis, but was not a willing seller at that price if he was not interested in the continuation of the business relationship. The transaction described in the majority opinion, where M. & O. charged the Star a $20 per ton premium in 1948 for 10,000 tons, provides an illustration of a situation where a premium above prevailing price was necessary in order to induce a producer to sell where, as an alternative, he could have sold a different product to another customer on a more-profitable basis. If the Flambeau mill were not owned by the Star, it

presumably would not have been selling newsprint to anyone because it would have produced more high-grade paper.

It appears that the Star chose to produce newsprint at its Wisconsin mill only under the impetus of the shortage conditions, and considered this of sufficient advantage to it under those conditions to warrant foregoing the opportunity of producing high-grade paper for profitable sale. It seems to me that this is a type of situation where too many fictions are involved in the application of the fair-market-value principle, and that the department adopted a method of allocation of the taxpayer's income to the Wisconsin operation which was not unreasonable.