EDITH N. TRACY, EXECUTRIX OF THE LAST WILL AND TESTAMENT OF MATTHEW J. NEVINS, Sr., DECEASED, APPELLANT, v. ARCHIBALD S. ALEXANDER, TREASURER OF THE STATE OF NEW JERSEY, AND AARON K. NEELD, DEPUTY DIRECTOR, DIVISION OF TAXATION, DEPARTMENT OF THE TREASURY OF THE STATE OF NEW JERSEY, RESPONDENTS.

IN THE MATTER OF THE ESTATE OF MATTHEW J. NEVINS, Sr., DECEASED.

Argued January 18, 1955—Decided February 7, 1955.

Mr. *Jerome C. Eisenberg* argued the cause for appellant (*Messrs. Starr & Weinberg,* attorneys; *Mr. Ralph Neibart* and *Mr. Eisenberg* on the brief).

Mr. *William A. Moore* argued the cause for respondents (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J.   The executrix complains in this transfer inheritance tax proceeding of the bureau's evaluation of a minority stock interest in a closely held corporation.   We certified of our own motion her appeal to the Appellate Division.

The decedent died June 29, 1951.   The bureau assessed 531 shares of the common stock of Nevins-Church Press, Inc.,

a New Jersey corporation, at $813.54 per share. Appellant contends that the value of the stock is not in excess of $600 per share, the value determined for federal estate tax purposes by the Federal Bureau of Internal Revenue.

The company manufactures labels and was founded by the decedent many years ago. His son, Theodore C. Nevins, has run the business since 1936, and it has prospered. Sales from 1946 to 1950 averaged about $4,000,000 annually. Almost 90% of the sales have been and are to two customers who for years have purchased their label requirements from the company but are under no obligation to do so—a point emphasized by appellant as having an important bearing on the worth of the stock. Profits after taxes averaged $352,000 annually during the years 1946 to 1950, or about $130 per share; but dividends were limited to $35 to $40 per share annually. A new plant and new equipment were acquired during 1950-1951, reflecting an increase of fixed assets on the books from $375,000 to $900,000. The book net worth of the company's assets at decedent's death indicated a book value for the stock of $986.42 per share, exclusive of good will.

When the decedent died 2,706 of the 2,708 common shares outstanding were held in two trusts. One trust of 2,175 shares was created in 1936 by decedent and his wife for the benefit of their five children, two sons, said Theodore C. Nevins and Matthew J. Nevins, Jr., and three daughters. The transfer of the shares in this trust was not deemed to be taxable by the Bureau. The other trust, holding the 531 shares involved in this proceeding, was created by the decedent in 1940 and the transfer of these shares thereunder was deemed to be taxable as one intended to take effect at decedent's death. That transfer was in substance a gift at that time of 424 shares to Theodore and 107 shares to Matthew, Jr., the decedent simply reserving the right to dividends during his lifetime and the trustee, a Montclair bank, being designated merely as "custodian of the shares" with "no other duties" except "to cause the dividends thereon to be paid to the said Matthew J. Nevins, Sr., during his

life, and to distribute the stock" to the two sons on his death. If either son died before the donor, that son's shares were to be distributed to the son's estate.

The 1936 trust indenture was unusual in that it withheld from the trustees the power to govern the company through the exercise of majority stockholder's rights and vested that power in Theodore C. Nevins under the broad provision that "the said Theodore C. Nevins shall operate the business of the said Nevins Church Press without interference by the said Trustees" unless his management was terminated by the unanimous vote of a named committee of the trustees. Theodore's brother and sisters have apparently been at times resentful of his management, especially toward what they consider a niggardly dividend policy, but it does not appear that any attempt has been made to have the committee of the trustees oust him. Appellant insists, however, that Theodore's one-man control and his conservative dividend policy should have been recognized by the bureau as a factor making the sale of the minority interest particularly difficult except at a tempting, that is, a low, price.

The bureau's duty under *R. S.* 54:34–5 is to determine the "clear market value" of the property subject to the tax. The clear market value is the fair value of the property as between one who desires but is not compelled to buy and one who is willing but not compelled to sell. *Schroeder v. Zink,* 4 *N. J.* 1, 13 (1950). Determination of value is often difficult in the case of shares of stock closely held and seldom or never sold, but, however difficult the discovery of such market value, the statutory standard is the one by which the bureau's determinations of value are and must be controlled. *Grell v. Kelly,* 132 *N. J. L.* 450 (*Sup. Ct.* 1945). The bureau is not lacking techniques of evaluation to discharge its duty in such cases. Principles by which to arrive at a reasoned and informed judgment of the bargain which such a seller and such a buyer would reach have been developed and ordinarily their application is a problem for experts experienced in their use. *Whittemore v. Fitzpatrick,* 127 *F. Supp.* 710 (*U. S. D. C. Conn.* 1954).

402

The officials of the bureau charged with making appraisals have the standing of experts. *Meyers v. Margetts*, 6 *N. J. Super.* 115 (*App. Div.* 1950). The bureau is itself an administrative agency exercising *quasi*-judicial functions, created by the Legislature and, like other agencies of the State administering other tax laws, designed to bring an "informed judgment from specialized experience to the nice balancing and ultimate resolution of the many complex factors involved," including, of course, the coordination and application of principles of evaluation acceptable in the circumstances of the particular case. See *Delaware, L. & W. R. Co. v. City of Hoboken*, 10 *N. J.* 418 (1952). Our appellate courts accord proper deference to the legislative policy in this regard and, unless error on the part of the bureau is apparent from the record, will not usually disturb its findings of value, or independently determine it, and certainly not merely because we might reach a different result were the responsibility ours to make the determination in the first instance.

The bureau complied with the requirement implicit in *R. S.* 54:34–9 and *R. S.* 54:34–12, cf. *Family Finance Corp. v. Gough*, 10 *N. J. Super.* 13 (*App. Div.* 1950), and supported its determination by findings of the basic facts upon which it rests. While the Transfer Inheritance Tax Law does not make the requirement explicit, all of the reasons which led us to emphasize the necessity for written findings by the Division of Tax Appeals, *Delaware, L. & W. R. Co. v. City of Hoboken, supra*, apply with equal force to determinations of complex valuations for purposes of transfer inheritance taxes. As was said in that case, "justice to the parties and considerations of the principles governing judicial superintendence of this important administrative agency required * * * determinations based upon adequate findings of fact." 10 *N. J.*, at *page* 425. But the bureau did not supply this taxpayer with a copy of its "Determination of Facts" and "Analysis of Director's Valuation" when it notified the taxpayer of the determination. This resulted in needless waste of time and expense. The taxpayer first learned of their existence when the bureau filed a certified

copy of its record on this appeal. It therefore became necessary for the appellant to obtain an order from the Appellate Division remanding the proceeding to the bureau to afford her an opportunity to present additional evidence to meet the matter relied upon by the bureau. Among the other many advantages of carefully drawn findings is that they "save the time of the litigants and the courts," *Feller, Prospectus for the Further Study of Federal Administrative Law,* 47 *Yale L. J.* 647 (1938). That desirable result was lost in this case. We hold that the bureau should supply its findings to a taxpayer simultaneously with its notice of determination. The prohibition of *R. S.* 54:33–8 against disclosure of this and other data is no barrier. That statute itself provides that the prohibition does not apply to "the executor, administrator or a beneficiary entitled by the will or by intestate law to share in the estate, or the duly authorized attorney of the executor, administrator or beneficiary."

The bureau's determination of facts states that its appraisal was "based on asset, or book value, adjusted to give effect to all other circumstances which exist with regard to this stock." A sale, at $244.48 per share, in January 1948, 3½ years before decedent's death, of the interest of a daughter beneficiary of the 1936 trust was rejected by the bureau as too remote to be evidential of value; and a series of negotiations in November 1949 initiated by Theodore to have the company buy out the interests of his brother and sisters in the 1936 trust at $500 per share was considered of little evidential value since no sale was consummated, although that failure was apparently not because of disagreement upon value. The bureau discounted the book value $172.88, which is approximately 18%, in recognition of the minority position of the stock as influenced by Theodore's control and his dividend policy and the fact of the company's dependency upon two customers. The factor 18% was not used as such; the reduction of $172.88 from book value merely represented the Bureau's best judgment of the proper allowance to reflect the minority interest. Consideration was also given to the results of capitalizing average profits on a 15% basis

and average dividends on a 6% basis which produced values of $867.19 and $616.42 respectively.

Upon the remand appellant submitted the views of an expert, a security analyst of acknowledged qualifications. The expert challenged the validity of the bureau's adjusted book value base, stating that it was "irrelevant to consider liquidating values" when valuing the stock of a "going concern." He insisted that the proper approach to arrive at value per share was the "price earnings basis." As he employed this basis he first determined the prices at which stocks of 20 companies deemed by him comparable to Nevins-Church Press had sold on security exchanges at the time of decedent's death. He then determined the number of times these prices exceeded earnings for the last fiscal year of the companies and the percentage of the prices that was paid by way of dividends. The median price-earnings ratio was 7.115 and the median yield 6.6%. He next capitalized the $40 dividend rate of Nevins-Church Press at 6.6% and produced a value of 606 per share. That value was only 4.04 times 1950 earnings, which he considered low and increased to approximately five times earnings, or $750 per share. He did not use the 20 stock median of 7.115 (which would produce about $1,067.50 per share) because he was of the opinion that "each of the 20 companies was entitled to a higher rating than the Nevins-Church Press." His final computation, to allow for the fact that the 531 shares represented a minority interest, was to deduct 25% from the $750 value per share, to arrive at a value of $562.50 per share for the 531 shares, which, he said, in his "considered opinion" was the value thereof on June 29, 1951, the date of decedent's death.

In a supplemental determination of facts the bureau joined issue with appellant's expert both as to his rejection of the bureau's book value base and his deduction of 25% as the adjustment to reflect the minority interest, characterizing the latter "to be more or less an arbitrary amount." Appellant on her brief cites no authority suggesting that in valuing a minority interest of a closely held corporation the

price earnings basis is the only proper one, indeed even the preferred one, or that the book value basis is an improper one. The bureau, on the other hand, cites several New Jersey decisions where the book value basis was approved in valuing stock of a closely held corporation. *In re Moore's Estate*, 104 *N. J. Eq.* 400 *(Prerog.* 1929); *Plum v. Martin*, 132 *N. J. Eq.* 1 *(Prerog.* 1942); *Renwick v. Martin*, 126 *N. J. Eq.* 564 *(Prerog.* 1939). At best the record discloses a disagreement between experts, and no sufficient reason appears for preference for the view of appellant's expert over that of the bureau.

The same is true as to the disagreement as to the amount of discount to adjust for minority interest. Texts and decisions attest to the necessity for some adjustment because a minority stockholder cannot force liquidation and must accept the majority's dividend policy and thus cannot effectively demand a price based upon the intrinsic book value of his shares or the company's earnings. *Bonbright, Valuation of Property, p.* 247 (1937); *Drennen, Valuation of Estate Interests,* 30 *Taxes* 534, 544 (July 1952); *Whittemore v. Fitzpatrick, supra; Grell v. Kelly, supra.* But no standard percentage or particular formula for determining the amount of deduction is suggested, *Whittemore v. Fitzpatrick, supra.* We cannot say that the bureau's deduction from book value of $172.88, or about 18%, is inadequate and the appellant's expert's 25% from base price the proper one. The stress placed by appellant upon the hazards of a business dependent upon two customers overstates the picture, in our view. The situation has obtained for many years, and the company's large investment in a new plant and new equipment indicates the lack of any real concern that it will not continue.

Moreover, it is questionable that the 531 shares represent a minority interest in the true sense. As noted above, 424 of those shares are Theodore's and have been his for all practical purposes since his father created the 1940 trust. They have enhanced his control of the company and he is hardly in the position of a minority stockholder who must

accept the will of the majority as to matters which, in Theodore's case, his control can ameliorate.

Appellant argues that the 1948 sale of the deceased daughter's stock at $244.48, and the 1949 price of $500 discussed in that year, represented proportions of 37% and 62% of the book value at those respective times and that the application of even the higher percentage to the bureau's book value of $986.42 as of June 1951 would produce a maximum value of $612. Apart from the reasons which moved the bureau to reject both those transactions as having little, if any, evidential force in determining value as of June 1951, there was a substantial change in the company's assets, brought about by the acquisition of the new plant and equipment, which distinguishes the situation from that in the case under the federal tax laws cited by appellant, *In re Schroth*, 5 *B. T. A.* 326 (1926), where that method of valuation was approved.

Finally, appellant contends that the bureau gave insufficient consideration to the federal estate tax valuation of this stock at $600. Concededly, it was a relevant fact brought to the bureau's attention and appellant does not suggest that the state authorities should follow the federal assessment. Neither taxing agency is under any duty to adopt the figure arrived at by the other, and if the state authorities on proper grounds reach a contrary conclusion from the federal agency the state appellate court must sustain the state agency. Indeed, nothing appears to show the method employed by or the facts before the federal bureau which would explain the result reached by it. The federal finding is on this record merely another expression of expert opinion and the state bureau is not obliged to give it greater weight than other expert opinion before it.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.