IN THE MATTER OF THE ESTATE OF
HAAKON I. ROMNES, DECEASED.

Argued December 12, 1977—Reargued September 25, 1978—
Decided February 6, 1979.

Mr. *Robert D. Borteck* and Mr. *Ronald M. Pflug* argued the cause for appellants Karen R. Olenzak, et al. (*Messrs. Pitney, Hardin* and *Kipp,* attorneys; Mr. *Donald B. Kipp,* of counsel; Mr. *Kipp* and Mr. *Borteck,* on the brief).

Mr. *Herbert K. Glickman,* Deputy Attorney General, argued the cause for respondent Mr. Sidney Glaser, Director, Division of Taxation (Mr. *John J. Degnan,* Attorney General of New Jersey, attorney; Mr. *Stephen Skillman,* Assistant Attorney General, of counsel).

The opinion of the court was delivered by

MOUNTAIN, J. The executors of the estate of Haakon I. Romnes filed a transfer inheritance tax return with the New Jersey Transfer Inheritance Tax Bureau, listing among the decedent's assets a survivor's annuity that derived from an employee benefit plan of the decedent's employer, American Telephone and Telegraph Company. The annuity provided for annual fixed income payments to decedent's widow, Aimee C. Romnes, which would continue during the remainder of her lifetime. In valuing this asset, the executors claimed the right to take as a reduction the commuted value, as of the date of death, of all estimated federal income taxes that would thenceforth be payable by Mrs. Romnes upon her annual receipt of those payments. The Bureau denied the claim, as did the Appellate Division, 148 *N. J. Super.* 401 (1977). We granted certification upon the executors' petition. 74 *N. J.* 284 (1977).

The decedent died on November 19, 1973. As an employee of American Telephone & Telegraph Company he was a member of the Company funded "Plan for Employees' Pensions, Disability Benefits and Death Benefits." Among the elective options available to an employee-member was a pension payable to a surviving spouse and denominated an "annuitant's pension." To take advantage of this option an eligible employee could elect to receive a smaller monthly amount upon his retirement and during his own lifetime, than the maximum to which he was entitled. Thereafter, upon his death, one-third of the reduced pension would be paid to his designee for the remainder of that person's lifetime. The decedent's normal retirement pension under the plan was $12,794.45 per month. He exercised his option in favor of the annuitant's pension, however, and thereby became entitled to receive a reduced monthly amount of $11,297.50 so that upon his death his spouse would then receive an annuitant's monthly pension of $3,765.84 for life (later increased to $4,425.76 as a result of adjustments not relevant for present purposes).

Upon decedent's death the executors included in the transfer inheritance tax return the gross value of the annuitant's pension in the amount of $350,000. There is no dispute as to the accuracy of this calculation. They claimed, however, the right to reduce this sum by the commuted value, as of the date of decedent's death, of estimated federal income taxes which decedent's spouse would be required to pay upon receipt of the monthly pension payments.[1] The amount of taxes thus calculated by the executors was approximately $96,430. Again there is no dispute as to the calculation. Thus the executors claim that the taxable value of this annuity should be reduced to $254,200.

Originally the executors took the position that an administrative regulation, N. J. A. C. 18:26-8.10(d)[2] should be

---

[1]The annuity is exempt from federal estate taxes since it is payable under a "qualified" pension plan as defined in the Internal Revenue Code. See 26 U. S. C. A. § 2039(c). For federal income tax purposes, however, the proceeds of the annuity are fully taxable to the decedent's spouse.

[2]The regulation, since repealed, read as follows:

Where an asset reported in an estate or a taxable transfer to a beneficiary subjects the estate or beneficiary to an income tax liability by reason of income at death which under the pre-1942 Internal Revenue Code required that there be included in the income of a decedent for the taxable period in which his death occurred all the income accrued up to the date of his death, but which under the 1942 amendments to the Internal Revenue Code were not properly includible in computing the decedent's taxable income for the taxable year ending with the date of his death or for a previous taxable year under the method of accounting employed by the decedent, allowance may be made for the income tax liability less the proportionate amount of the federal estate tax, if any, in determining the value of the asset or transfer. . . . However, income at death which is determined to be "Income In Respect Of A Decedent" merely because it is "attributable" to the decedent's activities shall not be considered in the valuation of such asset. [Proposed Amendments Concerning Valuations, 6 N. J. R. 35(b) (January 10, 1974), effective February 13, 1974, 6 N. J. R. 124 (c) (March 7, 1974)]

interpreted—or redrafted—to afford them the relief they sought. While the case was pending in the Appellate Division, and before that court had rendered any decision, the Bureau repealed this particular regulation. Repeal Notice, 8 *N. J. R.* 356 (July 8, 1976); Deletion Notice, effective August 3, 1976, 8 *N. J. R.* 445 (September 9, 1976). In reply to a direct inquiry from this Court, the executors-appellants stated that they no longer place reliance upon the repealed regulation. We think this position is sound and accordingly will not refer further to this now-repealed rule.

The executors' present contention can perhaps be stated thus: The fund from which the annuity is to be paid was accumulated during Mr. Romnes' lifetime, forming, as it did, a part of the compensation he received from his employer. This part of his compensation—his employer's contribution to his pension plan—was not taxable to decedent during his lifetime, since it qualified for exemption under 26 *U. S. C. A.* § 402. But the tax obligation was only deferred. After Mr. Romnes' death the annuity payments his wife would receive, created in effect by her husband's lifetime earnings, would be subject to the federal income tax. Therefore the annuity payments, "accrued" at the decedent's death, may be said to reach Mrs. Romnes already burdened with this deferred tax obligation. Hence, the argument concludes, in placing a value upon the annuity, it is only fair and right that the amount of these income tax obligations be taken by way of reduction. Otherwise expressed, it is argued that since Mrs. Romnes will never enjoy in a beneficial sense that portion of her annuity payments that must be devoted to paying income taxes, she should not now be required to pay an inheritance tax upon what she will never beneficially receive.

The contention, so phrased, has great plausibility. But for the reasons set forth below we conclude that it is quite untenable.

I

### The Concept of Market Value

■ All parties agree that the single issue in this case is the question of value: For New Jersey transfer inheritance tax purposes, what value should be ascribed to Mrs. Romnes' annuity? All parties also agree—or at least give lip service to the proposition—that to decide this issue it is necessary to determine the clear market value of the asset. The relevant statute so provides:

Taxes imposed by Chapters 33 to 36 of this title (§ 54:33-1 et seq.) shall be computed upon the *clear market value* of the property transferred. [*N. J. S. A.* 54:34-5; emphasis added][3]

■ There is no real disagreement as to the definition of market value. It has very recently been accurately stated as follows:

[Market value is] the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts. [*Lavene v. Lavene*, 162 *N. J. Super.* 187, 192 . (Ch. Div. 1978)]

This time-honored definition has been accepted by practically every court in the land. It applies regardless of the purpose for which market value is sought, be it eminent domain, equitable distribution, taxes or whatever. Where

---

[3]Other sections of the Transfer Inheritance Tax Act that refer to "clear market value" as being the applicable criterion are *N. J. S. A.* 54:36-1 (vested remainders after estate for life or years), *N. J. S. A.* 54:36-3 (executory devise or contingent or defeasible estates in expectancy), *N. J. S. A.* 54:36-4 (estates subject to a power of appointment). *N. J. S. A.* 54:34-9, defining the duties of appraisers, specifies that they shall appraise the property "*at its fair market value*" (emphasis added). Clear market value and fair market value are synonymous terms. *Tracy v. Alexander*, 17 *N. J.* 397, 401 (1955).

there is a real, active market, this determination is simple. For instance, the market value of shares of stock of corporations listed on a stock exchange can be determined directly by reference to published market quotations. Market value of residential or business real estate can usually be determined by an examination of comparable sales, representing, as they do, the judgment of the marketplace. But with respect to certain other assets, the fixing of market value may be more difficult. This is true, for instance, with respect to shares of stock of a closely held corporation, which are seldom or never bought and sold. It is also true, at least to some extent, of various kinds of income interests, including an annuity such as we have here. In such cases, where a real, active market is not available with respect to a particular asset, the concept of market value is nonetheless retained; it is never abandoned for anything else. What we do, at least as far as New Jersey transfer inheritance taxes are concerned, is to create a hypothetical buyer and a hypothetical seller, whom we then place in a hypothetical marketplace. We attribute to each of these persons all information which might affect value, and then, weighing all relevant factors, decide how they would reach a price satisfactory to each. The process is well described in a leading treatise upon this subject:

> The courts have adopted the position that all factors that would fix a price in the market place must be considered in the process of valuing an asset. In every situation where an asset must be valued, an artificial market place must be created, with a willing buyer and seller, each having knowledge of all the factors which will affect the final price. [*Beck, New Jersey Inheritance and Estate Taxes*, 55 (1974)]

This Court has often said the same thing.

> The starting point in valuation problems is the statute itself. *R. S.* 54:34–5 ordains that the transfer inheritance tax is to be computed upon "the clear market value of the property transferred." *Grell v. Kelly*, 132 *N. J. L.* 450, 451 (Sup. Ct. 1945). Given an

established market the solution is simple; absent actual sales the appraiser moves into a hypothetical market, *Newberry v. Walsh*, 20 *N. J*. 484, 497 (1956), which he constructs by using criteria which will likely gauge the thinking of one who desires but is not compelled to sell and one who is willing but not compelled to buy. *Schroeder v. Zink*, 4 *N. J*. 1, 13 (1950). This is a highly complex process which does not admit of exactness. The difficulty, however, is not to be overcome by disregarding it. "The statutory standard is the one by which the bureau's determinations of value are and must be controlled." *Tracy v. Alexander*, 17 *N. J*. 397, 401 (1955); *Grell v. Kelly*, *supra*. [*Bassett v. Neeld*, 23 *N. J*. 551, 555–56 (1957)]

\*    \*    \*    \*    \*    \*    \*    \*

And:

The bureau's duty under *R. S*. 54:34–5 is to determine the "clear market value" of the property subject to the tax. The clear market value is the fair value of the property as between one who desires but is not compelled to buy and one who is willing but not compelled to sell. *Schroeder v. Zink*, 4 *N. J*. 1, 13 (1950). Determination of value is often difficult in the case of shares of stock closely held and seldom or never sold, but, however difficult the discovery of such market value, the statutory standard is the one by which the bureau's determinations of value are and must be controlled. [*Tracy v. Alexander*, 17 *N. J*. 397, 401 (1955)]

Or:

It is immaterial, of course, that no sale has taken place. If market value is to be an index of appraisal we necessarily deal in a hypothetical transaction so far as the claimant is concerned. [*Newberry v. Walsh*, 20 *N. J*. 484, 497 (1956)]

Justice (later Chief Justice) Case, speaking for our former Supreme Court, expressed the point especially well. In considering the value of shares of a closely held corporation, he said:

The mandatory statutory direction (*R. S*. 54:34–5) is that "taxes imposed . . . shall be computed upon the clear market value of the property transferred." We think that the legislature used those words in their ordinary meaning. The tax is computed upon *value;* upon *market* value; upon the *clear* market value. Some kinds of

property always have a market and a quickly ascertainable price in that market; as for instance certain widely distributed securities traded daily in large volume on the floor of an exchange. Other classes of property have a "slow" but nevertheless a definite market; and real estate properties are ordinarily such. Still other classes of property, such as stock holdings in small, closely held corporations, present a difficult problem. . . . The problem may not be solved by disregarding it. It can be very perplexing; so perplexing that the Prerogative Court in such a case (*In re Moore*, 104 *N. J. Eq.* 400) was led to declare that "the clear market value is impossible of ascertainment" — an observation that we hesitate to accept for the reason that it seems to exclude the mandatory statutory scheme of appraisal.

\* \* \* \* \* \* \* \*

However difficult it may be to discover the market value of an asset, such a discovery must, under the statute, remain the goal. What the property may be worth to the seller or what it may be worth to the buyer is important chiefly as a criterion to help in establishing market value. [*Grell v. Kelly*, 132 *N. J. L.* 450, 451–52 (Sup. Ct. 1945)]

■ In such a hypothetical market we apply an *objective* standard. "The test of market value is objective." *Baetjer v. United States,* 143 *F.* 2d 391, 396 (1st Cir. 1944). Or, as another court has put it,

The test of fair market value is completely objective and has no reference to the peculiar position of the particular seller making the sale. [*Kansas City Star Co. v. Wisconsin Dept. of Taxation*, 8 *Wis.* 2d 441, 99 *N. W.* 2d 718, 724 (1959)]

The use of an objective standard necessarily precludes resort to any factors personal to the seller or the buyer. Courts have consistently so held.

In determining market value of the property, you should not consider any value peculiarly personal to the owners . . . . [*Wilmington Housing Authority v. Harris*, 47 *Del.* 469, 93 *A.* 2d 518, 521–22 (Super. Ct., 1952)]

A valuation limited to what the property is worth to the purchaser is not market value. [*Boston Gas Co. v. Assessors of Boston*, 334 *Mass.* 549, 137 *N. E.* 2d 462, 473 (1956)]

The term "market value" connotes, of course, sale value as distinct from intrinsic value or value to some particular person [*Columbia Gas of Kentucky, Inc. v. Maynard*, 532 *S. W.* 2d 3, 5 (Ky. Ct. App. 1975)]

■ The main difficulty with the position of the executors would appear to result from the manner in which they have approached the issue before us. In attempting to determine value—the only issue in the case—the executors appear to look first to the benefit that the *individual recipient* shall *personally* receive. Their contention seems to be that this beneficial interest is the measure of clear market value for transfer inheritance tax purposes. Guided by the clear language of the statute and a time honored definition of that language, we would state the proposition differently: *Objectively determined clear market value is the proper measure of the beneficial interest subject to tax.* The value of the asset for inheritance tax purposes is not a value peculiar to the legatee or beneficiary, it is value established in a real or hypothetically created market. This is what the Legislature has ordained and it is what this Court, pursuant to legislative direction, has continuously prescribed.

■ Thus, if we approach the problem of determining value in the orthodox, conventional method suggested above, it becomes instantly apparent that neither the hypothetical seller nor the hypothetical buyer would have any interest at all in Mrs. Romnes' prospective tax liability. It would not be a factor that either would consider in any way as being relevant to a determination of price. A hypothetical purchaser of such an income interest as this annuity would be interested in the annuitant's health, in her life style, and in the solvency of the payor—certainly not here in question. He would be particularly interested in the value of the income interest as calculated by insurance companies or as determined by use of the American Experience Table of Mortality or the United States Life Tables. He would be utterly unconcerned with the annuitant's personal income tax picture.

Nor would a hypothetical seller, about to divest himself of the income interest, be concerned in any way with a presumptive future liability he would never be called upon to meet. As soon as he divested himself of the interest, the

prospective future liability would cease to exist. The same would be true if Mrs. Romnes herself is thought of as the seller. She would have no interest in a prospective liability that was about to end.

Finally, is there any even remote possibility that Mrs. Romnes would accept as the purchase price of her annuity the amount of money that she asks the State of New Jersey to accept as being the value of this asset? There is of course no such possibility. She would presumably fix an asking price at about $100,000 above the figure she would have the Bureau accept. This simple fact emphasizes as much as anything can how far afield from the criterion of market value the position of the executors has strayed.

## II

### Consequences of the Executors' Contention

Although we choose to rest our decision primarily upon the issue of market value discussed above, we feel that some attention should be given to the probable consequences that might ensue were the executors' contention to prevail.

Consideration should first be given to the potential breadth and scope of such a ruling. Were it to apply to the annuity here involved, must it not also apply to other income interests? Most importantly, must it not also apply to a conventional life estate, as where a testator establishes a testamentary trust, his wife to receive the income for life and upon her death the principal to be distributed among his children or grandchildren? It is a life tenant's interest in such a trust that we refer to as a conventional life estate.

Seeking to probe this point further, we addressed a letter to counsel, asking, among other things, whether the reduction in value here sought should also apply with respect to the income interest of such a conventional life tenant. Appellants replied that it should not and gave as reason for the differentiation, that unlike the annuity payable to Mrs.

Romnes, the interest of a conventional life tenant "is not accrued at the decedent's death."[4]

As we understand the argument, it may be stated as follows: The pension rights of which Mrs. Romnes is the present beneficiary were earned by her late husband during his lifetime. They represent or are the fruits of such past earnings and therefore may be described as "accrued" at the date of Mr. Romnes' death. The income to be received by a conventional life tenant, on the other hand, is not so accrued at the death of the testator but is to arise in the future, as income is earned upon the principal of the trust fund created by the decedent's will.

This is a correct statement; everything said above is readily conceded. But what is *not* conceded is that this distinction so drawn forms any viable basis for disparate valuation or tax treatment.

At this point it is important to recall and emphasize what was stated earlier—a proposition as to which there is complete agreement: The only issue in this case is value— what, for transfer inheritance tax purposes, is the value of

---

[4]Initially the executors also urged as a basis of distinction that conventional life estates are not subject to the inheritance tax. This position was abandoned at oral argument where it was conceded that such life estates are in fact taxable. The concession was well taken. Life estates are taxable under *N. J. S. A.* 54:34–1 and the method of valuation is set forth in *N. J. S. A.* 54:36–2. Cases in New Jersey dealing with problems incident to the assessment of inheritance taxes on life estates, or the manner of collecting such taxes, include *In re Diehl's Estate*, 88 *N. J. Eq.* 310 (Prerog. Ct. 1917), aff'd 89 *N. J. Eq.* 209 (E. & A. 1918) (tax calculated on value of life estate but paid from corpus), followed in *Gates v. Plainfield Trust Co.*, 121 *N. J. Eq.* 460, 488a (Ch. 1937), aff'd 122 *N. J. Eq.* 366 (E. & A. 1937) ; *Stengel v. Edwards*, 98 *A.* 424 (Sup. Ct. 1916) (estate for life or widowhood properly taxed as life estate). The text writers agree that life estates are taxable, and they set forth in some detail the manner in which the value of such an estate is to be determined. *Beck, New Jersey Inheritance and Estate Taxes, supra,* §§ 16, 43; *Rogers, New Jersey Transfer Inheritance Tax* §§ 273, 274 (1940).

this income interest. We have no other issue before us. So unless the distinction set forth above affects value, it is not relevant to our discussion. And it in no way affects value.

The distinction, in respect of each interest, looks to the source of the fund from which the income interest derives and by pointing to the differences in the respective sources leaps to the totally unwarranted and unproven conclusion that there is therefore a difference in value as to the respective assets being transferred. Not so. There is no difference in value. An example and a moment's reflection should suffice to establish the point.

Suppose we consider two business men, A and B. A creates, from earnings during his lifetime, as did Mr. Romnes, certain pension rights which upon his death take the form of an annuity payable to his wife for life in the sum of $50,000 per year. B, on the other hand, accumulates sufficient capital during his lifetime—from salary, investments, inheritance—again the source is immaterial, so that at the time of his death he is in a position to establish, and does establish, a testamentary trust that will yield his wife annually an income of $50,000. Suppose further that each wife has exactly the same life expectancy as the other and that A and B die on the same day while domiciled in New Jersey. Everyone concedes that the $50,000 annual income of each widow is completely subject to the federal income tax. Would a hypothetical purchaser pay any more for one income interest than the other? There appears to be no reason why he would do so. There is no rational basis upon which to distinguish one from the other *as to value*. Certainly the sources of the income interests are different. One may be described as "accrued" and the other not. It is readily apparent, however, that any such distinction is of no significance as long as we bear in mind that we are solely concerned with the *value* of what is being transferred.

Accordingly, we are entitled to conclude that were the favored treatment urged by the executors to be made available to recipients of an income interest such as that Mrs.

Romnes enjoys, it would also have to be made available to conventional life tenants and probably to all recipients of any income interest. Some of the more important results of this conclusion should not be overlooked.

First, it should be noted that conventional life estates are very common and that this is especially true with respect to large estates. While the trust device—normally creating and including a life estate—has always flourished, its popularity has increased sensationally since the advent of the marital deduction in the federal Internal Revenue Code in 1948. Estate planning techniques now, much more often than not, will include resort to so-called "marital" and "non-marital trusts." Each of these includes a life estate. This is especially true where large sums of money are involved.

Were the executors' contention to prevail, such a ruling would very sharply diminish the revenue that the State might thereafter expect to receive from the taxation of life estates. And yet the contention is said to be reached as a matter of statutory interpretation, which must ultimately rest upon legislative intent. The Legislature must be presumed, then, to have intended to lessen the tax impact on estates for life and other similar income interests. In fact the precise opposite is demonstrably the case. *L.* 1977, *c.* 219 changed, *inter alia,* the basis for calculating the value of an estate for life by substituting the United States Life Tables for the American Experience Table of Mortality, to become effective in respect of decedents dying on or after January 1, 1978. *N. J. S. A.* 54:36–2. The Senate Revenue, Finance and Appropriations Committee Statement which accompanied Assembly No. 2314 — *L.* 1977, *c.* 219, concluded by saying,

The change in the basis for valuation of an estate for life or years will increase State revenue. An estimate of increased revenues is not available.

Hence it seems reasonable to conclude that the Legislature is anxious to increase revenues derived from the taxation of life estates. To adopt the executors' argument would go far to diminish or obliterate completely the gains foreseen and sought by this legislation.

A further consequence of the appellants' claim is equally significant and somewhat more startling. The suggested method of calculating the amount by which the value of the income interest is to be reduced because of estimated federal income tax liability is as follows: First, calculate the recipient's estimated income tax for the year in question, including the amount of the annuity as taxable income. Then compute the estimated tax excluding the annuity. Finally, subtract the latter from the former. The result, it is said, will be the amount of federal income taxes attributable to the annuity.

It will be at once seen that the wealthier the annuitant, or other recipient of an income interest, the greater the difference will be between the two calculations. Assume, for instance, that one annuitant has no taxable income other than her annuity. Assume a second annuitant has $100,000 of other taxable income. Assume further that each annuity is in the amount of $50,000. One recipient will pay a tax on $50,000 of income and the other on $150,000. But the $50,000 annuity received by the wealthier recipient will be taxed at very much higher rates than will the $50,000 received by the annuitant with no other taxable income. This results, applying the above formula, in the weathier recipient receiving a very much larger reduction to apply to the base value of her income interest. Thus it would follow that the rich would pay a smaller tax than the less affluent and the very rich less than the rich. This rather startling result must again rest upon presumed legislative intent. But of course neither this nor any other tax statute has ever been intentionally drafted to classify taxpayers according to wealth and then impose graduated taxes in such a way that the richest pay the least.

## III

A word must be said as to the speculative and conjectural nature of the appellants' proposal. The reduction in value results from an estimate of future federal income tax liability. But suppose the liability never eventuates, or never materializes in the sum claimed as a reduction? Suppose the widow remarries and thus becomes eligible to file a joint tax return with her husband at more favorable rates? Suppose a trustee invests the corpus of a trust in tax-free securities, resulting in the life beneficiary paying little or no income tax? Suppose the tax law drastically changes or the investments of the trust property sharply diminish in value? Suppose the income recipient regularly donates her annuity to charities? Many other similar possibilities will come to mind. While it is true that absolute precision with respect to valuation may often be impossible, there are nevertheless limits to the degree of conjecture that is permissible. What is here proposed would appear to far transcend the bounds of speculation to be found in any acceptable tax structure.

## IV

There is a suggestion in appellants' brief that if the favorable tax treatment they seek is not to be granted, Mrs. Romnes may be exposed to double taxation. The concern is fanciful. Mrs. Romnes, and her late husband as well, have successfully minimized the incidence of taxes in a way to suggest that they have received excellent advice with respect to their estate plans. Let us review the matter briefly.

The portion of the decedent's annual compensation which took the form of contributions into his pension fund by his employer was not subject to federal income tax to him at any time during his life. 26 *U. S. C. A.* § 402. Furthermore, upon his death, the annuity which then became payable to his widow was exempt from the federal estate tax by virtue of the pension plan qualifying under 26 *U. S. C A.* §

2039(c). All this is conceded by appellants. Mrs. Romnes has nothing to fear from double taxation. She may more accurately be described as the fortunate beneficiary of very competent estate planning. For instance, compare the Romnes family tax picture with that of the business man referred to as B in the example given above. The latter, by hypothesis, accumulated sufficient capital during his lifetime to establish by will a testamentary trust of which his wife is life beneficiary. To the extent that the capital fund was earned by him it was presumably subjected to an annual federal income tax. Not so in the case of Mr. Romnes. Furthermore, upon B's death, the assets allocated to the conventional trust established by his will would be subject to the federal estate tax to the extent the marital deduction were not available. The annuity we are considering was wholly exempt from this tax.

The appellants place considerable reliance upon *Estate of Rose*, 465 *Pa*. 53, 348 *A*. 2d 113 (1975). In that case the Pennsylvania Supreme Court was called upon to determine the value, for Pennsylvania inheritance tax purposes, of the decedent's undistributed share of partnership profits from his law firm. This asset, obviously accrued income, was received by decedent's executors shortly after his death. The estate paid the federal and state income taxes generated by these receipts. It then sought to diminish the value of this asset by the amount of these taxes. A majority of the court sustained this result.

In considering this decision we should note several things. In the first place, the Pennsylvania Supreme Court was sharply divided.[5] Moreover there are a number of obvious

---

[5] The main opinion attracted the adherence of only three members of the court and hence is a plurality rather than a majority opinion. One justice wrote a concurring opinion reaching the same result, but upon an entirely different thesis. One justice simply concurred in the result. Two members of the court dissented for reasons very similar to those set forth in this opinion.

and important respects in which that case is markedly
different from this. In *Rose* the tax had already been paid at
the time the reduction in value was sought. There was no
speculation as to the amount of the tax, such as there is here.
Furthermore the income taxes paid by the estate can be seen
as being very similar to expenses paid by an executor in
collecting an estate asset, as for instance the fee paid an
attorney for collecting an account receivable. It was in effect
necessary to pay the taxes in order to acquire the asset. We
have nothing like that here.

## V

The dissenting opinion seeks to support the position which
is there espoused by calling attention to certain language
appearing in the early cases of *Bugbee v. Roebling*, 94 *N. J.
L.* 438 (E. & A. 1920) and *In re Dellinger*, 94 *N. J. Eq.* 409
(Prerog. Ct. 1923). For instance, in *Bugbee* the Court said,
". . . the tax is to be calculated on the beneficial interest
actually received by the legatee and not on what he would
receive if there were no federal tax." 94 *N. J. L.* at 442.
Presumably this is thought to sustain the thesis that in
fixing market value we look first to see what actually reached
the beneficiary in terms personal to himself. The error in
adopting such an approach has been discussed above.

But in any event there is nothing in *Bugbee* which can
possibly support such an argument, even were it valid.
*Bugbee* dealt with one simple issue: Should the federal
estate tax be taken as a *deduction* in the calculation of the
New Jersey transfer inheritance tax? It was determined that
it should.[6] The concept of market value, with which we are

---

[6]This holding was of short duration. In 1926 an amendment to
the transfer inheritance tax act included the following:
  Providing, further, however, the amount due or paid the govern-
  ment of the United States as a federal estate tax shall not be
  considered as an expense of administration and shall not be al-
  lowed as a deduction. [P. L. 1926, ch. 294]
This has remained the law ever since.

here concerned, was not before the Court at all. The Court was asked to decide only whether the Legislature—the then applicable statute being silent upon the point—had intended that the federal estate tax should be treated the same way that debts, funeral expenses and administration expenses were treated—as deductions in arriving at the net taxable estate. To attribute to the words quoted above the significance suggested can be done only by reading the words completely out of context and entirely ignoring the true holding of the case.

The same is true with respect to *Dellinger*. The court there considered the so-called "ratio clause" which sets forth the manner in which the New Jersey assets of a nonresident decedent are to be taxed. It determined that in calculating the tax there should be "read into the 'ratio clause'" the deductions allowable in determining the net taxable estate. Again no issue of market value was before the court. The actual language of Vice-Ordinary Buchanan makes clear what the court was actually deciding:

I do not recall that there has ever been any doubt * * * that in the calculation of the tax * * * the debts of decedent and administration expenses were to be deducted from the assets in arriving at the estate or property upon the value of which the tax was to be computed. To those there is added, by the decision in *Bugbee v. Roebling, supra,* as likewise deductible in such a case, the amount of the federal estate tax. And the legislature has now, by the amendment of 1922 (P. L. 1922, ch. 174), added * * * a specific provision for, and a list of, such deductions; these include debts, funeral * * * and administration expenses, including commissions, attorney's fees, a proportion of property taxes accrued but not due and the federal estate tax. In every calculation of the tax * * *, therefore, the comptroller must start with the preliminary fact that the assets, the proper appraised value whereof he is to fix and thereupon to compute the tax, have been diminished to the extent necessary to satisfy these deductible items or charges against the estate. [*In re Dellinger,* 94 *N. J. Eq.* at 416–17]

The decision is a simple holding that in employing the statutory "ratio clause" to determine the tax upon local

assets of a nonresident, the proper factor to use is the net rather than the gross estate—the gross estate less deductions. There is nothing about market value in the case.

For all of the foregoing reasons the judgment of the Appellate Division is affirmed.

HANDLER, J., dissenting. The narrow but perplexing issue in this case is whether federal income taxes payable by a surviving spouse upon a pension annuity should be taken into account in its valuation for New Jersey State Transfer Inheritance Tax purposes under *N. J. S. A.* 54:34–1 *et seq.* The annuitant's pension had been created under a deferred compensation program established by decedent's employer and, because it was "qualified" under the federal internal revenue laws, the federal taxes ordinarily due on earned income were not required to be paid by decedent during his lifetime. Upon the death of decedent, however, those taxes became payable by the surviving widow by operation of the federal income tax law. I believe that it is correct and fair that they be included in the calculus for determining the "clear market value" of the annuity under *N. J. S. A.* 54:34–5. Since the majority of the Court believes otherwise, I dissent from its opinion.

Expectedly, there are broad areas of agreement on my part with the majority. There is no doubt, for example, that an annuity or pension acquired by a decedent and made payable by him to another at or after his death is subject to the transfer inheritance tax, *N. J. S. A.* 54:34–1(c) ; *N. J. A. C.* 18:26–5.19; *N. J. A. C.* 18:26–5.9; *Cruthers v. Neeld,* 14 *N. J.* 497, 503 (1954) ; *Hagy v. Kelly,* 135 *N. J. Eq.* 436 (Prerog. 1944) ; *In re Langhaar,* 125 *N. J. Eq.* 374 (Prerog. 1939). See also *In re Kaegebehn,* 16 *N. J. Misc.* 388 (Orph. 1938) ; *In re Rothschild,* 71 *N. J. Eq.* 210 (Prerog. 1906), aff'd o.b. 72 *N. J. Eq.* 425 (E. & A. 1907). The AT&T annuitant's pension in this case conforms to the definition of an annuity. It encompasses an unconditional right to payment of a fixed sum of money at specific periodic intervals,

*Tobler v. Moncrief,* 72 *N. J. Super.* 48, 51–52 (Ch. Div. 1962), to a designated recipient, *Bryne v. Bryne,* 123 *N. J. Eq.* 6, 14 (Ch. 1938), with payments terminating upon the death of the beneficiary. *J. Appleman, Insurance* § 81 at 105; see *e. g., Cruthers v. Neeld, supra,* 14 *N. J.* at 502–503 (a plan similar to the AT&T plan termed "annuity retirement contract").

Moreover, as pointed out by the majority, the term "clear market value", which is the measure of the Transfer Inheritance Tax under *N. J. S. A.* 54:34–5 is generally taken to mean "market value", "fair market value" or "actual market value". Typically, it calls for the hypothetical structuring of the proverbial willing buyer — willing seller sale. *Ante* at 144–145. But, as also pointed out by the Court, it is not always easy to fashion a market for certain kinds of assets. *Id.* at 144–145. For that reason the determination of clear market value or market value, *Tracy v. Alexander,* 17 *N. J.* 397, 401 (1955); *N. J. A. C.* 18:26–1.1, must encompass and entail the objective assessment of all relevant factors bearing upon worth, *Bassett v. Neeld,* 23 *N. J.* 551, 557 (1957); see also *Rosenthal v. Kingsley,* 97 *N. J. Super.* 286, 289 (App. Div. 1967); *Grell v. Kelly,* 132 *N. J. L.* 450 (Sup. Ct. 1945).

Clear market value, as the measure of the Transfer Inheritance Tax, necessarily refers to the beneficial interest of what is actually received by the transferee, since it is *that* interest which is the subject of the transfer inheritance tax assessment. *Bugbee v. Roebling,* 94 *N. J. L.* 438, 440–442 (E. & A. 1920); *In re Dellinger,* 94 *N. J. Eq.* 409, 416 (Prerog. 1923); also, *Hamlen v. Martin,* 128 *N. J. Eq.* 383, 396–398 (Prerog. 1940); *cf. In re Arkell,* 103 *N. J. Super.* 266, 270 (App. Div. 1968). I do not agree with the Court, therefore, that the position of the executors, which focuses upon the beneficial interest of the survivor, departs from these basic principles of valuation by importing subjective and personal standards into the valuation process. To the contrary, the executors have sought nothing more than that the Transfer Inheritance Tax Bureau (Bureau) consider objectively the

actual nature and all relevant characteristics of the asset and value it accordingly.

The Bureau argued in this case that a liability for federal income taxes, such as claimed by the Estate, could be "deducted" from the valuation of an annuity only if it fell within subsection (a) of the valuation statute, *N. J. S. A.* 54:34–5(a), that is, if the item was (1) a "debt of the decedent" and (2) was "owing at the time of death". Since the federal income tax liability upon the survivor's annuity was payable by the survivor and not the decedent, it could not, according to the Bureau, be considered a "debt of the decedent". And, since the federal tax liability referred to taxes to be paid in the future, it could not be considered to have accrued prior to the "time of death".

The executors assert that the statutory deductions under *N. J. S. A.* 54:34–5(a)–(e) are separate from the basic valuation provision of the statute and are not to be considered as valuational factors. Consequently, in seeking an allowance for the federal income taxes which will be payable by the beneficiary on the receipt of the annuity, the Estate was not attempting to take a statutory "deduction" from the clear market value of the annuity. Rather, it was claiming a "reduction" in the value of the pension annuity based upon a diminution intrinsic in the valuation of the asset itself.

Despite its arguments in this case, the Bureau has seemingly recognized that the enumerated statutory deductions are separate from valuation as such and are to be taken after the valuation of the asset. *N. J. A. C.* 18:26–2.4. Before the National Association of Tax Administrators Conference, for example, the State Supervisor and the Chief Examiner for the Transfer Inheritance Tax Bureau stated:

In determining deductions from the estate for inheritance taxes the distinction between statutory deductions from the estate and

reductions in the value of the transferred asset should be kept in mind.

[Maida & Mulholland, "Paper on N. J. Transfer Inheritance Tax", [1973] *CCH, Inheritance, Estate & Gift Tax Rep.*, (All-State New Matters) ¶ 20,729].

The Estate, therefore, is essentially correct in its analysis that factors in the nature of encumbrances, expenses or liabilities may be relevant in arriving at the clear market value of estate assets even though they are not included among the deductions specifically listed in *N. J. S. A.* 54: 34–5. An expense or liability which is incurred in the actual creation of an asset is such a factor; where an obligation is intrinsic in the origin of the property interest, it should be reflected in its valuation. *Cf. Newberry v. Walsh,* 20 *N. J.* 484 (1956).

Federal income taxes, in the context of this case, ought to be considered in ascertaining the clear market value of the annuitant's pension. They are an expense or liability which arises with the actual creation of the pension itself. *Cf. In re Estate of Rose,* 465 *Pa.* 53, 348 *A.* 2d 113 (Sup. Ct. 1974); also, *In re Tench,* 23 *Fiduc. Rep.* 478 (Pa. Ct. C. P. 1973), *CCH, Inheritance Estate & Gift Tax Rep.* (New Matters) ¶20,736 ("The income tax obligation is implicit in the account receivable") ; *cf. Publicker v. Comm. of Internal Revenue,* 206 *F.* 2d 250 (3 Cir. 1953), *cert.* den. 346 *U. S.* 924–925, 74 *S. Ct.* 312, 98 *L. Ed.* 418 (1954). The annuitant's pension, furnished in exchange for continued, faithful employment, constituted deferred income earned by decedent. *Cf. Russell v. Princeton Laboratories, Inc.,* 50 *N. J.* 30, 35 (1967). Federal income taxes were intrinsic in the earning of that income, even though payment therefor was deferred with the postponement of the receipt of the income. The tax liability inhered in the establishment of the pension as well as in its transfer to the beneficiary.

The Bureau itself recognizes the propriety of federal taxes in the valuation of property interests consisting of income or the right to receive income in certain contexts:

Federal income taxes paid on income in respect of a decedent operates as a reduction in the value of the assets giving rise to the federal income tax in order to determine the market value at the date of the death for New Jersey inheritance tax purposes.

> [Maida & Mulholland, supra (1973) *CCH, Inheritance Estate & Gift Tax Rep.* at 90,070].

Under a previous administrative regulation, 6 *N. J. R.* 35 (b) ; 6 *N. J. R.* 124 (c), the Bureau acknowledged the propriety of a reduction in the value of inherited property for federal income taxes attributable to "income in respect of a decedent".[1] "Income in respect of a decedent" under the Internal Revenue Code, 26 *U. S. C. A.* § 691, has been defined as those "* * *

---

[1] The regulation was still in effect when the Estate filed its transfer inheritance tax return. It provided in pertinent part:

(d) Where * * * a taxable transfer to a beneficiary subjects the * * * beneficiary to an income tax liability by reason of income at death which under the pre-1942 Internal Revenue Code required that there be included in the income of a decedent for the taxable period in which his death occurred all the income accrued up to the date of his death, * * * allowance may be made for the income tax liability less the proportionate amount of the Federal estate tax, if any, in determining the value of the asset or transfer. * * * However, income at death which is determined to be "Income In Respect Of A Decedent" merely because it is "attributable" to the decedent's activities shall not be considered in the valuation of such an asset.

Since, by its terms, the deduction under the regulation could be taken only if under the pre-1942 Internal Revenue Code the decedent would have been required to include such income in his last tax return, and the survivor's annuity here by definition would not have been so includable, the Bureau disallowed the Estate's claim.

Notwithstanding the repeal of the regulation, this administrative rule is not irrelevant, as suggested by the majority, *Ante* at 142–143. The Bureau maintained in this appeal that its disallowance of the Estate's claim, though now based on the statute, is entirely consistent with its former regulation.

post-death payments [which] are, in fact, due to services performed by or economic activities of the decedent". See *Levin v. United States,* 254 *F. Supp.* 640, 642 (D. Mass. 1966), vacated on other grounds, 373 *F.* 2d 434 (1 Cir. 1967) and cases cited therein. As such it is the "* * * activities and economic efforts of the decedent in his lifetime * * *" which are pertinent, *Trust Co. of Georgia v. Ross,* 392 *F.* 2d 694, 695 (5 Cir. 1967), *cert.* den. 393 *U. S.* 830, 89 *S. Ct.* 97, 21 *L. Ed.* 2d 101 (1968) ; and whether or not said payments were "* * * the fruits of a man's professional activity during his lifetime * * *", *Reiglemen's Estate v. Commissioner of Internal Revenue,* 253 *F.* 2d 315 (2 Cir. 1958). Moreover, it is not necessary that the decedent would have been entitled to the money had he lived in order for such payments commencing upon his death to be subject to treatment as income in respect of a decedent. *Bernard v. United States,* 215 *F. Supp.* 256, 260 (S. D. N. Y. 1963) ; see *Estate of Nilssen v. United States,* 322 *F. Supp.* 260 (D. Minn. 1971) ; see also *Miller v. United States,* 389 *F.* 2d 656 (5 Cir. 1967) ; *contra Lascomble v. United States,* 177 *F. Supp.* 373 (E. D. Va. 1959) ; see generally, Annot., "What Constitutes Income in Respect of A Decedent Within Meaning of § 691(a)(1) of Internal Revenue Code of 1954 (26 *U. S. C. A.* § 691(a)(1))", 13 *A. L. R. Fed.* 613 (1972).

The annuitant's pension in this case shares substantially the major definitional characteristics of "income in respect of a decedent". This should dispose of the fears expressed in the majority opinion to the effect that income received by the beneficiary of a life estate, a remainder interest or other contingent and future interests is the equivalent of the income received under the annuitant's pension in this case and, on that equation, the valuation of those kinds of income would have to be similarly reduced by the federal taxes payable by the recipients thereof. *Ante* at 151–152. That would not be so, because the income beneficiaries of conventional life and other future estates would not by definition be the recipients of income previously earned and taxable. Hence,

the concern of the Court that such income interests would be subject to reductions in value for transfer inheritance tax purposes is groundless.

There is, under the majority view, a distinct element of double taxation in failing to consider federal income taxes in the valuation of the pension annuity. The transfer inheritance tax based on the valuation standards endorsed by the majority would be computed on a portion of the beneficiary's income which she could never have received because it was taxable upon its creation and was subject to taxes upon its transfer to her with the death of decedent. There is, moreover, no off-setting deduction of state inheritance taxes permitted for federal income tax purposes. *Treas. Reg.* sec. 1.64–2(c).[2] It is generally held that, while double taxation is not unconstitutional, *Illinois Cent. R.R. Co. v. Minnesota,* 309 *U. S.* 157, 60 *S. Ct.* 419, 84 *L. Ed.* 670 (1940), a construction of law to authorize multiple taxation will not be adopted unless required by the express terms of the statute or by necessary implication. *New Orleans v. Houston,* 119 *U. S.* 265, 7 *S. Ct.* 198, 30 *L. Ed.* 411 (1887); *Old Dominion Copper Mining & Smelting Co. v. State Board of Taxes & Assessments,* 91 *N. J. L.* 173, 178–179 (E. & A. 1918); *Jersey City Gaslight Co. v. Jersey City,* 46 *N. J. L.* 194, 196 (E. & A. 1884); *In re Estate of Ross, supra.* "In this as in all other cases of statutory construction, we start with the fundamental assumption that the legislature means to be just. It needs no argument to prove the injustice of double taxation." *Bugbee v. Roebling, supra,* 94 *N. J. L.* at 439.

The court also has expressed concern that the Estate's position would entail speculation and conjecture in the

---

[2] It is aside the point and somewhat misleading for the majority to characterize the result as one favoring wealthy beneficiaries, *Ante* at **153**. In this case, for example, the beneficiary's tax bracket for the balance of her life expectancy was quite low and the federal tax ascribable to the annuity during this period for valuation purposes was relatively modest. *Post* at **165**, n. **3**.

valuation of the annuity. *Ante* at 154. To take into account the federal taxes due on the pension annuity when transferred to the beneficiary is not to interject a speculative standard of valuation. Rather, it is a reflection of the actual complexity of the valuation process which is unavoidable if fairness and realism are to be achieved. The statute is geared to this. For example, it makes provision for the appraisal of property, *N. J. S. A.* 54:34–6, and for the determination of "fair market value" by appraisal, *N. J. S. A.* 54:34–9, which encompasses all relevant circumstances bearing upon value. *Bassett v. Neeld, supra,* 23 *N. J.* at 557. An annuity as a future, terminable property interest is subject to special valuation procedures, *N. J. S. A.* 54:34–1 through 7, including among other techniques the use of expectancy tables, *N. J. S. A.* 54:34–2; *N. J. A. C.* 18:26–8. 22; *In re Langhaar, supra.* See also *Tilney v. Kingsley,* 43 *N. J.* 289 (1964); *cf. In re Wallace's Estate,* 100 *N. J. Super.* 485 (App. Div. 1968), aff'd o.b. 53 *N. J.* 137 (1969); *D. Beck, New Jersey Inheritance Taxes,* § 44 (1974). Thus, the difficulty and uncertainty of dealing with the unknowable future are an inescapable aspect of the valuation of any future property interest. The lack of exactitude in predicting the precise amount of future income taxes does not of itself nullify their real impact upon the present worth of a taxable asset.[3] *Cf. R. H. Macy & Co., Inc. v. Director, Division of*

---

[3]The Bureau and the Estate had no difficulty in grappling with these complexities in the valuation of the annuity in this case, taking into account future income taxes. In rounded figures, the federal income tax attributable to the pension for the year 1974 was $30,185; for 1975 the estimated tax, based upon a tax rate of 8.5% and factored at 5% for the deferred year, yielded a present value of the income tax of $3,810; for 1976 and subsequent years, utilizing, in addition to the 5% factor, an effective tax rate of approximately 20% and an annuity calculation based upon the recipient's age of 66, the estimated annual income tax attributable to the pension was $9,615 and the present value of the aggregated taxes was $62,436, bringing the total present value of such taxes to $96,430. This kind of calculation is not uncommon in the valuation of future and contingent interests under the Transfer Inheritance Tax Act.

*Taxation,* 77 *N. J. Super.* 155 (App. Div. 1962), aff'd 41 *N. J.* 3 (1963); also *Tenore v. Nu Car Carriers,* 67 *N. J.* 466, 484-494 (1975). As stated in variant but pertinent settings, "[t]he difficulty, however, is not to be overcome by disregarding it." *Bassett v. Neeld, supra,* 23 *N. J.* at 553. "With anything as sure as 'death and taxes', the courts are avoiding their responsibilities when they decline to make the best guess they can, once all the reasonably available evidence has been brought before them." *Tenore v. Nu Car Carriers, supra,* 67 *N. J.* at 493 n. 26.

For these reasons, I would reverse the decision of the Appellate Division and allow the effect of federal income taxes to be recognized in the valuation process in determining clear market value of the annuitant's pension.

Chief Justice HUGHES and Justice SULLIVAN join in this opinion.

*For affirmance*—Justices MOUNTAIN, PASHMAN, CLIFFORD and SCHREIBER—4.

*For reversal*—Chief Justice HUGHES and Justices SULLIVAN and HANDLER—3.